JULIAN JACKSON ET AL. *v.* HOUSING OPPOR-
TUNITIES COMMISSION OF MONTGOMERY
COUNTY

[No. 402, September Term, 1979.]

*Decided December 6, 1979.*

The cause was argued before MOORE, LOWE and LISS, JJ.

*David S. Greene,* with whom were *Kamerow & Kamerow, P.C.* on the brief, for appellants.

*Donald C. Allen,* with whom were *Katherine L. Bishop* and *Allen, Thieblot & Alexander* on the brief, for appellee.

LISS, J., delivered the opinion of the Court. LOWE, J., filed a concurring opinion at page 317 *infra.*

This case brings to mind the perhaps apocryphal story that is told about a particularly bitter debate concerning a bill pending in the Maryland Legislature. The principal opponent of the bill made an impassioned plea during the course of which he opined that if the Legislature passed the particular measure that it had before it, it would be giving away the State House. Undaunted by that allegation the sponsor of the measure in a paraphrase of Job's comment on his biblical misfortunes rose to his feet and thundered, "The Legislature giveth; the Legislature taketh away; blessed be the name of the Legislature." The story is appropriate in light of the case *sub judice* where the Legislature seems to have given, but has then taken away. Whether the name of the Legislature should

be blessed in situations of this kind is a matter of opinion which we shall not here express.

This appeal arises out of an accidental personal injury suffered by Julian Jackson, appellant, on premises owned and operated by Housing Opportunities Commission of Montgomery County (hereinafter designated as the Commission). On August 2, 1976, the appellant, a minor child, was an invitee on the premises known as Pomander Courts, a development operated by the Commission. The appellant, while playing with friends, leaned his weight on a metal guard railing located adjacent to steps leading to the basement of one of the apartments. The railing collapsed and the appellant fell sustaining severe injuries.

Appellants, the minor child and his parents, wrote the Commission advising them of their claim, and were advised by an insurance company that it (the insurance company) was the liability carrier for the Commission, and that all medical reports and bills were to be sent to the company. These records were sent to the carrier and several discussions concerning the settlement of the case were held. At the conclusion of these discussions appellants filed suit in the Circuit Court for Montgomery County for personal injuries sustained by the minor child and for pain and suffering as well as medical expenses. The declaration alleged negligence on the part of the Commission in failing to maintain Pomander Courts in a safe condition.

Appellee, after service, filed a motion raising preliminary objection to the suit on the grounds that there was no waiver of sovereign immunity, and even if there had been, there were no funds available out of which a judgment could be recovered. It is contended by the appellee that the Commission is an agency of the State of Maryland created pursuant to Article 44A of the Maryland Annotated Code and is entitled to sovereign immunity. Appellee's motion came on for hearing and Judge Fairbanks, the presiding judge, granted appellee's motion and dismissed the case. Subsequently, appellants filed a motion for reconsideration which was denied by the same judge. It is from the order granting appellee's motion raising preliminary objection and the order denying reconsideration that this appeal was noted.

The issues raised by appellants may be stated as follows:

I. Did the Maryland Legislature expressly waive sovereign immunity as to the Housing Opportunities Commission of Montgomery County?

II. Even if the Legislature did not expressly waive immunity, has it been waived for the purposes of this case by necessary and compelling implication?

III. Was the waiver of sovereign immunity, whether express or implied, an effective waiver in this case?

I.

While appellants in their brief concede only *arguendo* that the Commission is a state agency, they make no effective argument to the contrary. On the basis of the reasoning set out by the Court of Appeals in *Katz v. Washington Suburban Sanitary Commission,* 284 Md. 503, 509-11, 397 A.2d 1027 (1979), we conclude that the Commission is indeed a state agency created by Article 44A of the Annotated Code of Maryland (1957, 1971 Repl. Vol., 1978 Cum. Supp.) and is entitled to the defense of sovereign immunity unless that defense has been waived either expressly or by implication by the Maryland Legislature.

The determination of whether sovereign immunity has been waived must be found from a reading of the statute by which the agency was created. The language of the statute must clearly indicate that a waiver was intended by the Legislature. *Katz v. Washington Suburban Sanitation Commission, supra; O & B, Inc. v. Md.-Nat'l Cap. P. & P.,* 279 Md. 459, 369 A.2d 553 (1977); *Lohr v. Upper Potomac River Commission,* 180 Md. 584, 26 A.2d 547 (1942).

An examination of Article 44A of the Maryland Code discloses that Section 8 of that Article provides in relevant part that the appellee Commission in this case is granted:

[A]ll the powers necessary or convenient to carry out and effectuate the purposes and provisions of this article, including the following powers:

(a) To sue and be sued; to have a seal and to

alter the same at pleasure; to have perpetual succession; to make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the authority; and to make and from time to time amend and repeal by-laws, rules, and regulations, not inconsistent with this article, to carry into effect the powers and purposes of the authority.

We are mindful that the use of the phrase "to sue and to be sued" has not, in and of itself, been construed in Maryland case-law as an absolute consent to any and all kinds of suits. *See Katz, supra; O & B, Inc., supra;* and *Lohr, supra.* Furthermore, we are required to construe the phrase in connection with the other language in the act creating the state agency. The established rule is that in determining whether the Legislature intended to waive expressly the defense of sovereign immunity, the Legislature must have granted the agency the power to sue and be sued and the "action must be necessary to carry out the purposes for which the commission was created." *Lohr, supra,* at 549. *Accord, Weddle v. School Commissioners,* 94 Md. 334, 51 A. 289 (1902).

In its original enactment, the Legislature in Section 2 of the Act made a finding and declaration of necessity which stated:

It is hereby declared, (a) that there exist in the State insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the State there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded and congested dwelling accommodations; that the aforesaid condition cause an increase in and spread of disease and crime and constitute a menace to health, safety, morals and welfare of the residents of the State and impair economic values; that these

conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (b) that these slum areas cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as herein defined) would therefore not be competitive with private enterprise; (c) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired; that it is in the public interest that work on such projects be commenced as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions hereinafter enacted, is hereby declared as a matter of legislative determination.

Specifically, with respect to Montgomery County, the Legislature, in 1974, adopted Chapter 508, Section 1, codified as Article 44A, Section 8A which in essence restated the finding and declaration of necessity as it applied to Montgomery County.

In establishing the Housing Authorities Article, the Legislature in Section 8 enumerated the powers necessary or convenient to carry out and effectuate the purposes and provisions of the Article. In subsection (b) was the power "[w]ithin its area of operation: To prepare, carry out, acquire, lease and operate housing projects; to provide for the construction, reconstruction, improvement, alteration or repair of any housing project or any part thereof." Subsection (d) of Section 8 gives the authority broad powers as follows:

To lease or rent any dwellings, houses,

accommodations, lands, buildings, structures or facilities embraced in any housing project and (subject to the limitations contained in this article) to establish and revise the rents or charges therefor; to own, hold, and improve real or personal property; to purchase, lease, obtain options upon, acquire by gift, grant, bequest, devise, or otherwise any real or personal property or any interest therein; to acquire by the exercise of the power of eminent domain any real property; to sell, lease, exchange, transfer, assign, pledge or dispose of any real or personal property or any interest therein; *to insure or provide for the insurance of any real or personal property or operations of the authority against any risks or hazards;* to procure insurance or guarantees from the federal government of the payment of any debts or parts thereof (whether or not incurred by said authority) secured by mortgages on any property included in any of its housing projects. [Emphasis supplied.]

The Court of Appeals said in *Katz v. Washington Suburban Sanitary Commission,* 284 Md. at 513:

As heretofore indicated, a legislative waiver of sovereign immunity is ineffective unless specific legislative authority to sue the agency has been given, and unless there are funds available for the satisfaction of the judgment, or power reposed in the agency for the raising of funds necessary to satisfy a recovery against it. *American Structures v. City of Balto.,* 278 Md. 356, 359, 364 A.2d 55 (1976); *Chas. E. Brohawn & Bros. v. Board,* [269 Md. 164, 304 A.2d 819 (1973)]; *University of Maryland v. Maas,* 173 Md. 554, 559, 197 A. 123, 125 (1938); *Fisher & Corozza Co. v. Mackall,* 138 Md. 586, 114 A. 580 (1921); *State v. Rich,* 126 Md. 643, 95 A. 956 (1915). To constitute an effective waiver, therefore, § 1-3 of the WSSC Code must contain both a clear waiver of immunity as to matters within the scope of the agency's duties and

obligations, and an authorization for the appropriation of funds to satisfy a judgment rendered against it in tort.

When we examine this statute, however, in the light of other statutes in which a clear waiver of sovereign immunity has occurred, we find Article 44A ineffective to meet the requirements of either an express or implied waiver of sovereign immunity as to this governmental agency. The legislative history of the waiver of sovereign immunity found to exist in *Katz, supra,* is substantially different from that found in this case. In *Katz,* the Court of Appeals pointed out that the original statute permitting the Sanitary Commission to sue or be sued had been amended to provide for the payment of judgments recovered against the Commission. The Court pointed out that Section 1-3 of the amended statute specifically provided:

"In the event of a judgment at law or in equity being recovered against said commission or for the purpose of amicably adjusting threatened or pending litigation, the commission shall at the annual tax levying period of the county council of Montgomery County and the county commission of Prince George's County next succeeding the rendition of said judgment or compromise, certify to said county council of Montgomery County and county commissioners of Prince George's County, a tax rate, in addition to that required for its interest, serial bonds and sinking fund requirements, that will, when levied and collected under the provisions of ... [section 4-5 of this Code], produce an amount sufficient to satisfy said judgment or other sum including costs and counsel fees, if any, provided, however, that this provision shall relate only to any cause of action occurring subsequent to April 26, 1927...."

The provision of § 1-3 authorizing the WSSC to certify a tax rate sufficient to produce funds to satisfy a judgment rendered against it was not part of the section as it was

originally enacted. It was added by ch. 506 of the Acts of 1927, in apparent response to the decision in *Washington Suburban Sanitary Commission v. Magruder,* 12 F.2d 832 (D.C. Cir.), decided May 3, 1926. *Magruder* held that while the WSSC could "sue and be sued," it was nevertheless immune from suit because under § 1-3 as it then read, and the controlling Maryland law, the agency had no means to satisfy judgments in tort suits because it had no power "to raise money for the purpose of paying damages." 12 F.2d at 833. The 1927 amendment to § 1-3, which was effective only with respect to "any cause of action occurring subsequent to April 26, 1927," was, we think, a well-calculated and specific procedure to authorize the WSSC to acquire the funds necessary to satisfy a judgment rendered against it or to amicably settle threatened litigation. When read as a whole, § 1-3 clearly expresses a legislative intent to waive the WSSC's sovereign immunity. To hold otherwise would be to disregard both the "sue and be sued" clause and the provision for satisfaction of judgments which follows it. [284 Md. at 514-15.]

We are required to determine whether there are funds available for the satisfaction of a judgment rendered against the Commission or power reposed in the agency for the raising of funds necessary to satisfy such a judgment. We conclude that there are no such funds available nor does any such power exist.

Section 9 of Article 44A vests the Commission with broad powers to determine the rentals charged for the dwelling accommodations offered to eligible tenants and directs that:

> The authority shall fix the rentals for dwellings in its projects at no higher rates than it shall find to be necessary in order to produce revenues which together with all other available moneys, revenues, income and receipts of the authority from whatever sources derived will be sufficient (a) to pay, as the same become due, the principal and interest on the bonds of the authority; (b) *to meet the cost of, and to provide for, maintaining and operating the projects (including the cost of any insurance)* and the administrative expenses of the authority; and (c) to

create (during not less than the six years immediately succeeding its issuance of any bonds) a reserve sufficient to meet the largest principal and interest payments which will be due on such bonds in any one year thereafter and to maintain such reserve. [Emphasis supplied.]

The Legislature specifically granted to the Commission the authority to insure or provide for the insurance of any real or personal property or operations of the authority against any hazard or risks. It also authorized the authority to include the cost of insurance in its calculation of the rents to be charged the tenants. It did not, however, empower the Commission to include in its calculation of rents any sum of money necessary to satisfy a judgment rendered against the Commission or to amicably settle threatened litigation. There is nothing in the legislative enactment here being considered which sets out the limits of liability of the Commission and what, if anything, is required of the Commission in the event a judgment recovered against it exceeds the amount for which it is insured.

An examination of the statutes enacted by the Legislature involving other state agencies indicates that the Legislature has been extremely careful in those instances, where an effective waiver of sovereign immunity has been adopted, to spell out the obligations of the agency and the source from which payment of judgments rendered against it may be sought.

For example, in Article 41, Section 10A the Legislature in revoking the defense of sovereign immunity in contract actions specifically provided as follows:

(a) *Defense not to be raised in certain actions.* — Unless otherwise specifically provided by the laws of Maryland, the State of Maryland, and every officer, department, agency, board, commission, or other unit of State government may not raise the defense of sovereign immunity in the courts of this State in an action in contract based upon a written contract executed on behalf of the State, or its

department, agency, board, commission, or unit by an official or employee acting within the scope of his authority.

(b) *No liability for punitive damages.* — In any such action, the State, or its officer, department, agency, board, commission, or other unit of government is not liable for punitive damages.

(c) *Limitation of actions.* — A claim is barred unless the claimant files suit within one year from the date on which the claim arose or within one year after completion of the contract giving rise to the claim, whichever is later.

(d) *Funds to be provided in budget.* — In order to provide for the implementation of this section, the Governor annually shall provide in the State budget adequate funds for the satisfaction of any final judgment, after the exhaustion of any right of appeal, which has been rendered against the State, or any officer, department, agency, board, commission, or other unit of government in an action in contract as provided in this section.

The Legislature also enacted Chapter 825, Acts of 1976, effective July 1, 1976 which added subsection (CC) to Article 25A (grant of express powers to chartered counties). In that section, the Legislature specifically set out as follows the manner and the extent of waiver of sovereign immunity which could be provided by chartered counties by ordinance or by inclusion in the county charter:

To provide by ordinance or inclusion in the county charter for the waiver of sovereign immunity so that the county may be sued in tort actions in the same manner and to the same extent that any private person may be sued. Any chartered county enacting legislation or otherwise waiving sovereign immunity under this subsection shall carry comprehensive liability insurance to protect itself, its agents and its employees. The purchase of this insurance shall be considered as for a public purpose and as a valid

public expense. The liability of any county under this subsection may not be greater than $250,000 or the amount of its insurance coverage, whichever is greater, per individual per occurrence. A county which has adopted legislation or otherwise availed itself of the powers contained in this subsection may raise the defense of sovereign immunity to any amount in excess of the limit of its insurance coverage. In any case, the several counties or any county availing itself of the privileges of this subsection may not raise the defense of sovereign immunity in any claim of less than $250,000 or the amount of its insurance coverage, whichever is greater.

In 1978, the Legislature adopted a waiver of the defense of sovereign immunity on behalf of the state agency boards of education. Section 4-105 of the Education Article provides:

(a) *Comprehensive liability insurance.* — Each county board shall carry comprehensive liability insurance to protect the board and its agents and employees. The purchase of this insurance is a valid educational expense.

(b) *Standards for policies; coverage.* — The State Board shall establish standards for these insurance policies, including a minimum liability coverage of not less than $100,000 for each occurrence. The policies purchased under this section shall meet these standards.

(c) *Self-insurance; minimum coverage.* — (1) A county board complies with this section if it is self-insured for at least $100,000 for each occurrence under the rules and regulations adopted by the State Insurance Commissioner.

(2) A county board that elects to self-insure under this subsection periodically shall file with the State Insurance Commissioner, in writing, the terms and conditions of the self-insurance.

(3) The terms and conditions of this self-insurance:

(i) Are subject to the approval of the State Insurance Commissioner; and

(ii) Shall conform with the terms and conditions of comprehensive liability insurance policies available in the private market.

(d) *Defense of sovereign immunity.* — (1) A county board may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or if self-insured, above $100,000.

(2) A county board may not raise the defense of sovereign immunity to any claim of $100,000 or less.

An examination and comparison of these statutes with Article 44A, here at issue, convinces us that while the Legislature may have intended to waive sovereign immunity when it granted the right to sue and to be sued to the Commission, that that grant was in and of itself insufficient, by the authorities cited, to effect such a waiver either expressly or by implication. Nor did the grant of authority to purchase insurance accomplish a waiver of sovereign immunity.

The Court of Appeals has said in *Quecedo v. Montgomery County,* 264 Md. 590, 287 A.2d 257 (1972) that the mere existence of liability insurance will not be sufficient to create tort liability unless the "legislative enactments creating the agency or corporation considered as a whole lead to the conclusion that it was the intention of the Legislature to impose such liability on the agency. . . ." 264 Md. at 595. It is clear the Legislature, whatever it intended, failed to make available the funds required for the satisfaction of a judgment against this state agency and failed to invest the agency with the power to raise the funds necessary to satisfy any recovery against it. Under these circumstances, there has not been either an express or implied waiver of immunity.

There is one further matter which we feel impelled to address in this case. At the very beginning of the claim for damages, there is evidence in the record that the appellants were notified that the Commission "is a separate state agency with its own insurance coverage." Also in the record is an uncontradicted affidavit by appellants' attorney in response to the supplemental memorandum filed by the appellee before the hearing below. That affidavit established the fact that there had been correspondence, and negotiations with an identified insurance company which represented itself as the liability carrier for the appellee. No affidavit in opposition to these allegations was offered by the appellee. We therefore conclude that the appellee was, in fact, represented in this claim by the insurance company indicated.

No defense of sovereign immunity was raised until the parties were unable to reach an agreed settlement figure. That defense was then made for the first time when suit was filed against the Commission.

Such an eleventh hour tactic prevents taxpayers from having their day in court and also obviates a determination as to whether the state agency has properly met its obligation to provide safe housing for its tenants. If the Legislature does not move promptly to close this loophole, innumerable tenants will remain without redress for the grossest of negligence, and insurance companies will continue to collect premiums for coverage under policies in which they may be assuming no risk.

*Judgment affirmed, costs to be paid by appellants.*

*Lowe, J., concurring:*

I must concur that the law is as interpreted by the majority but I am compelled to deplore that a government agency created to provide housing, is not liable for its failure to provide it safely. If an insurance company accepts premiums to insure, it should be statutorily deprived of the shield of immunity to the extent of coverage sold as has been done

318

in the case of charitable institutions. See Md. Code, Art. 48A, § 480; *Eliason v. Funk,* 233 Md. 351 (1964); *Gorman v. St. Paul Fire Ins. Co.,* 210 Md. 1 (1956). See also Md. Code, Art. 43, § 556A. Such is a legislative concern, however, not one we may alter.

I am equally concerned that an insurance company has been paid premiums out of taxpayers' pockets to insure an immune agency. If this has knowingly been done, both the payor and the payee have misused public funds and, if not criminally liable, should be held civilly liable for the unwarranted and unauthorized expenditure. While these too may be legislative matters, they come quite close, and circumstantially may cross, the judicial line.

I concur — with reluctance — in the result.