984 A.2d 836

Devonte A. BROOKS, a minor, etc., et al.

v.

HOUSING AUTHORITY OF BALTIMORE CITY, et. al.

No. 14, Sept. Term, 2008.

Court of Appeals of Maryland.

Nov. 17, 2009.

Reconsideration Denied Jan. 8, 2010.

**604**

Suzanne C. Shapiro (Saul E. Kerpelman & Associates, P.A., Baltimore), on brief, for Petitioners.

J. Marks Moore, III (J. Marks Moore, III, LLC, Baltimore, Samuel M. Riley, Samuel M. Riley, LLC, Baltimore), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA, and JOHN C. ELDRIDGE (Retired, Specially assigned), JJ.

BARBERA, J.

We decide in this case whether the Housing Authority of Baltimore City ("HABC") enjoys governmental immunity from suits in tort if it has exhausted the limits of its commercial insurance policy in payment of prior claims. The case comes to us from the grant of summary judgment in favor of the HABC, the respondent, in a lead paint action brought by the petitioner, Devonte A. Brooks ("Brooks"). The HABC argued that, under Maryland's "Housing Authorities" law, Md.Code (1957, 2003 Repl.Vol.), Art. 44A,[1] as construed by *Jackson v. Housing Opportunities Comm'n of Montgomery County*, 289 Md. 118, 422 A.2d 376 (1980), it enjoys governmental immunity from suit because it exhausted the limits of its liability insurance policy.

The Circuit Court for Baltimore City agreed that, under *Jackson*, the HABC's governmental immunity was waived only up to the limits of its insurance coverage. The court concluded, moreover, that it was undisputed that the HABC had insurance coverage at the time the cause of action arose but, by the time Brooks filed suit, the coverage was exhausted. The court therefore ruled that the HABC was entitled to summary judgment.

Brooks noted an appeal to the Court of Special Appeals, which affirmed the judgment in an unreported opinion. For the reasons we shall explain, we reverse. We hold that Article

---

1. By Chapter 63 of the Acts of 2006, Article 44A was re-codified as Maryland Code (2006), §§ 12–101–12–175 of the Housing and Community Development Article. Former Article 44A was in force at all times relevant to the case at bar, and, unless otherwise indicated, all references herein are to that version of the statute.

44A, when read in its entirety, effects a complete waiver of governmental immunity from suit. By so holding we necessarily repudiate our language in *Jackson* stating the contrary. 289 Md. at 130, 422 A.2d at 382.

## I.

Brooks was born on November 4, 1993. Since then, he has lived with his mother in Baltimore City public housing, operated by the HABC. Brooks developed elevated blood lead levels, which he alleges resulted from his exposure to lead-based paint in the housing where he resided. Brooks, through his mother, Kimberly Wright, filed suit against the HABC on March 15, 2004. Brooks alleged negligence and violations of the Maryland Consumer Protection Act ("CPA"), Md.Code (1975, 2000 Repl.Vol.), §§ 13–301–13–501 of the Commercial Law Article ("CL"), and sought damages resulting from his injuries.[2]

The HABC filed a motion for summary judgment, arguing that its immunity from suit was waived only to the limits of its commercial insurance policy, which was exhausted by the time of Brooks's suit. The commercial insurance policy (hereafter the "Policy") to which the HABC referred was purchased by the HABC in 1993 from the Housing Authority Risk Retention Group ("HARRG").

The Policy was for three years, running from June 1, 1993 through June 1, 1996. Subsection H of the Policy contained a "Lead Based Paint Liability" rider, insuring the HABC liability coverage against " 'bodily injury' arising from the ingestion of or exposure to lead-based paint" occurring after June 1, 1988. The Policy had an annual coverage limit of $500,000 per occurrence and in the aggregate, on a "claims-made basis," and included a $25,000 per-claim deductible. The Policy was

---

2. Brooks also asserted a claim against Lawrence Polakoff, Leslie Polakoff, Chase Management, Inc., and CFAS Limited Partnership. A "Line of Dismissal" was entered for Leslie Polakoff. A consent judgment was later entered as to the other defendants on October 2, 2006.

subject to reduction for payment of claims, judgments, settlements, legal defense, and related costs.

The "Special Conditions" subsection of the lead-based paint liability rider provided that, if the lead-based paint coverage were cancelled, the HABC was entitled to obtain either a 3–month or a 15–month extension of coverage (commonly known as a "reporting tail"). The 3–month reporting tail would ensue automatically upon the cancellation date, without an additional premium paid. The 15–month reporting tail was available upon written request within 30 days of cancellation and payment of an additional premium to be determined by HARRG. Under the terms of the rider, any lead-based paint claims arising during the period of the reporting tail would be covered under the terms and conditions of the last annual coverage period during which coverage was in place. The Policy also provided that, if during an annual coverage period and any reporting tail the HABC were to supply HARRG written notice that the HABC "[became] aware of any circumstances which may subsequently give rise to a claim being made against [the HABC] . . . for damages arising out of the ingestion of or exposure to lead-based paint," then a claim relating to those circumstances and later brought against the HABC would be considered to have been made during the coverage period when the written notice was received.

On April 18, 1996, HARRG cancelled the lead-paint coverage rider in the Policy, effective immediately. After properly notifying HARRG of its intention to do so, the HABC purchased the 15–month reporting tail through July 18, 1997, and paid the additional premium of $74,880.27. The HABC thereby continued, through July 18, 1997, the $500,000 aggregate coverage limit provided during the 1995–96 annual coverage period.

Raymond A. L'Altrelli is the Insurance/Risk Manager for the HABC. In May 1997, Mr. L'Altrelli provided HARRG a list of names and other pertinent information concerning 73 children who had elevated blood lead levels (EBLs). Brooks, whose elevated blood lead level had been submitted to the

HABC by city health authorities in April 2006, was among the children listed in the HABC's submission to HARRG. The following month, the HABC sent a second list to HARRG. That list, too, contained Brooks's name. Mr. L'Altrelli stated in the letter that accompanied the first list that the "referenced EBL's are to be **noted as *occurrences* only** (since claims may never be filed)." (Emphasis in original.) He added that the HABC understood that, by supplying HARRG with written notice, HARRG would "afford coverage and defense under the current Policy provisions" should claims subsequently be filed by any of the children on the list. The HABC did not purchase lead-based paint liability coverage beyond the date of expiration of the reporting tail, July 18, 1997.

## The Lawsuit

We have said that Brooks, through his mother, filed suit against the HABC in March 2004. The HABC timely answered and thereafter moved for summary judgment. The HABC argued that Brooks's claim was reported to HARRG under the 1995–96 Policy year, pursuant to the 15–month reporting tail, and, as of September 19, 2003, the $500,000.00 coverage for lead-based claims was exhausted. The HABC maintained that Article 44A waives its governmental immunity only up to the available limits of its insurance policy. The HABC relied on the holding of *Jackson,* which states that the "combination of" the relevant statutory provisions "effects, by necessary and compelling implication, a limited waiver of the defense of sovereign immunity to the extent of permitting recovery only out of any sum payable on behalf of the HOC (Housing Opportunities Commission) by its insurer under applicable liability coverage." 289 Md. at 130, 422 A.2d at 382. In support of summary judgment, the HABC submitted, *inter alia,* an affidavit by HARRG's Regional Claims Manager attesting that Brooks's potential claim was reported in the 1995–96 Policy year and, as of September 19, 2003, the $500,000 limit of coverage was exhausted.

Brooks opposed the summary judgment motion on the ground that the HABC was not entitled to invoke governmental immunity in this case. Brooks argued that the language in *Jackson* to the effect that the statute creates only a partial waiver of immunity is *dicta* because it was not necessary to the decision in that case. Brooks further argued that the court should treat the facts of his case more like the cases at issue in *Gibson v. Housing Auth. of Baltimore City,* 142 Md.App. 121, 131, 788 A.2d 234, 240, *cert. denied,* 369 Md. 182, 798 A.2d 554; *vacated sub nom Housing Auth. of Baltimore City v. Smalls,* 369 Md. 224, 798 A.2d 579 (2002).[3] *Gibson* presented the question whether the HABC could assert governmental immunity for lead-based paint claims that arose when the HABC was not covered by a liability insurance policy. The intermediate appellate court answered "no" to that question, analyzing the issue as follows:

> HABC argues that its failure to carry statutorily required liability insurance for "all risks and hazards" will prevent the agency from being able to satisfy a judgment rendered in favor of the children and thus the HABC is immune from suit. If such a practice would be allowed, governmental agencies would be able to manufacture their own immunity simply by allowing their insurance to lapse. In instances where the legislature has mandated that the governmental agency carry insurance to allow for payment of successful suits brought against the agency, the autogenous of immuni-

---

**3.** *Gibson* involved five lead poisoning actions that were consolidated on appeal. In four of those cases, the HABC had appealed from the denial of summary judgment; in the fifth case, the plaintiff, Gibson, appealed from the grant of summary judgment in favor of the HABC. The HABC sought certiorari review of the Court of Special Appeals's decision that the HABC was not immune from the plaintiffs' suits. We denied the petition insofar as it related to respondent Gibson, *Housing Auth. of Baltimore City v. Gibson,* 369 Md. 182, 798 A.2d 554 (2002), and granted it insofar as it related to the remaining respondents, *Housing Auth. of Baltimore City v. Smalls,* 369 Md. 182, 798 A.2d 554 (2002). By per curiam order, we vacated the judgments of the Court of Special Appeals and remanded the case to that court with directions to dismiss the appeals by the Housing Authority because those appeals were taken from non-final judgments. *Housing Auth. of Baltimore City v. Smalls,* 369 Md. 224, 798 A.2d 579 (2002) (per curiam order).

ty would fly in the face [of] the legislative intent without submitting to it and create inequitable results. We will not allow such inequities to occur.

Therefore, in instances where the legislature has created a waiver from immunity for a governmental entity and required that insurance be obtained for liabilities resulting from its governmental conduct, that entity cannot fabricate its own immunity [ ] by failing to insure against those liabilities.

*Gibson*, 142 Md.App. at 131, 788 A.2d at 240.

Brooks argued, by extension of the logic underpinning *Gibson*, that the HABC attempted to manufacture its immunity by under-insuring itself and therefore was not entitled in his case to the defense of government immunity.

The Circuit Court interpreted *Jackson* and *Gibson* to hold that, "if [the HABC] did not fail to insure, it is not required to take additional action to provide for payment of a claim." The court therefore saw the issue on summary judgment to be "whether there is any dispute of material fact about" whether the HABC "failed to take appropriate measures to obtain insurance coverage given the facts reasonably available to it." The court reviewed the parties' exhibits offered in support of and in opposition to the motion, and concluded that "there is no basis for a dispute that [the] HABC failed to provide sufficient insurance, thereby forfeiting its immunity." Accordingly, the court granted summary judgment in favor of the HABC.

Brooks appealed to the Court of Special Appeals. While the appeal was pending in that court, Brooks filed a petition for writ of certiorari. We denied the petition. *Brooks v. Housing Auth. of Baltimore City,* 396 Md. 12, 912 A.2d 648 (2006). The appeal proceeded in the Court of Special Appeals, and in due course a divided panel of that court affirmed the judgment. *Brooks v. Housing Auth. of Baltimore City,* No. 06–1815, slip op. at 20 (Md.Ct.Spec.App. Dec. 18, 2006). The panel majority concluded, as had the Circuit Court, that the HABC's immunity from suit was waived only up to the limits of its insurance

coverage, and such limits were exhausted by the time Brooks filed suit. *Id.* at 16. The panel majority further concluded that the record does not support "a reasonable inference that the HABC knowingly was taking steps to under-insure itself in an effort to avoid liability for claims that might exceed Policy limits," as Brooks had argued. *Id.* There being no dispute of material fact on that issue, the panel majority held that the HABC was immunized from suit and, consequently, was entitled to summary judgment on Brooks's negligence claim.[4] *Id.* at 20. The panel also addressed Brooks's CPA claim and concluded that the claim was analogous to the common law torts of fraud or negligent misrepresentation, against which the HABC was entitled to assert governmental immunity. *Id.* at 26–27.

We granted certiorari to answer six questions, only four of which Brooks has pursued in his brief.[5] For purposes of

---

**4.** Judge Sally Adkins, now a member of this Court, filed a dissenting opinion to express, *inter alia,* her view that "there was a material dispute of fact as to whether [the] HABC knowingly and intentionally chose to under-insure for the 1996–1997 policy year, when it purchased the 15 month reporting tail and elected not to self-insure."

**5.** Those four questions are:

1. Can the Housing Authority of Baltimore City manufacture its own immunity from lead poisoning liability by claiming depletion of insurance coverage, when the Housing Authority refused to comply with insurance underwriting requirements to conduct lead risk assessments of its rental properties, thereby causing the cancellation of its lead poisoning coverage, and subsequently devised a plan to "sneak" (its own term) 73 potential childhood lead poisoning claims onto tail coverage for a previous year's $500,000 aggregate policy grossly inadequate to satisfy all potential judgments, rather than self-insure, even though other means to satisfy judgments exists?

2. Instead of being required to obtain or provide for liability insurance as mandated by the legislature to provide coverage for the lead poisoning of children, should the Housing Authority of Baltimore City be rewarded by immunity for its efforts to avoid its statutory obligations?

3. Does the Housing Authority of Baltimore City enjoy immunity from liability resulting from a violation of the statutorily created Maryland Consumer Protection Act, Annotated Code of Maryland, Commercial Law § 13–101 *et seq.?*

4. Does the Housing Authority of Baltimore City enjoy immunity from tort liability for torts arising out of the operation and manage-

discussion, we condense those questions into a single, over-arching question:

> Did the Circuit Court err in granting summary judgment in favor of the HABC on the ground that it was immune from the claims brought by Brooks because it was insured for the applicable period of time, notwithstanding that its coverage limits were exhausted?

## II.

"The doctrine of sovereign immunity from suit, root-ed in the ancient common law, is firmly embedded in the law of Maryland." *Katz v. Wash. Suburban Sanitary Comm'n,* 284 Md. 503, 507, 397 A.2d 1027, 1030 (1979). In Maryland, the doctrine applies to the State and its agencies. *Id.* The doctrine also applies to local governments and their agencies when tortious conduct arises out of governmental, rather than proprietary or corporate, functions. *Housing Auth. of Balti-more City v. Bennett,* 359 Md. 356, 359, 754 A.2d 367, 368 (2000). Therefore, the doctrine is "perhaps, more accurately characterized as 'governmental immunity.' " *Austin v. City of Baltimore,* 286 Md. 51, 53, 405 A.2d 255, 256 (1979); *accord Mayor and City Council of Baltimore v. Whalen,* 395 Md. 154, 163, 909 A.2d 683, 688 (2006).

The General Assembly has the authority to waive governmental immunity either directly or by necessary impli-cation. *Katz,* 284 Md. at 507–08, 397 A.2d at 1030. The test for ascertaining whether and to what extent governmental immunity is waived has two prongs: "[A] legislative waiver of sovereign [or governmental] immunity is ineffective unless specific legislative authority to sue the agency has been given, and unless there are funds available for the satisfaction of the judgment, or power reposed in [an] agency for the raising of funds necessary to satisfy a recovery against it." *Id.* at 513, 397 A.2d at 1033. Stated another way, "[a] waiver of sover-

ment of low income rental property that can be categorized as proprietary rather than governmental?

eign or governmental immunity from suit generally requires that two conditions be met. First, the Legislature must authorize suits for damages, and, second, there must be provision for the payment of judgments." *Kee v. State Highway Admin.*, 313 Md. 445, 455, 545 A.2d 1312, 1317 (1988).

### III.

### *The Parties' Contentions*

Whether the Circuit Court was correct in granting summary judgment in favor of the HABC turns on the question of whether that court correctly decided that the HABC was immune from Brooks's suit.[6] The parties, not surprisingly, are at odds on the answer to that question.

Brooks leads with the contention that the Circuit Court erred in concluding that the General Assembly intended only a partial waiver of housing authorities' immunity from suit. He argues that Article 44A, viewed in its entirety, evidences a complete waiver of immunity from suits in tort, and the language of *Jackson* stating the contrary is *dicta* that is incorrect and should not be followed. Brooks further argues, in the alternative, that even if Article 44A effects only a partial waiver of immunity up to the limits of applicable insurance, as *Jackson* states, there is a dispute of material fact concerning whether the HABC, by under-insuring, "manufactured" its immunity. Brooks argues that, assuming the HABC is engaged in a governmental function when maintaining and operating public housing, it failed in this instance to fulfill the statutory mandate to "insure or provide for insurance ... against any risks or hazards"; consequently, the HABC is not immune from suit. Brooks adds as a final argument the threshold contention that the HABC is not immune from suit

---

6. The parties agree that there is no genuine dispute of material fact. In determining the correctness of the court's grant of summary judgment, we view the record in the light most favorable to Brooks, the non-moving party, "and construe any reasonable inferences that may be drawn from the facts against the moving party." *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508, 518 (2007).

because, as a "landlord" operating a housing project that "only benefits a specially qualified group of low income tenants, and does not benefit the welfare of the whole public, the HABC is engaging in a proprietary function, not a governmental function."

The HABC counters that *Jackson* correctly holds that the General Assembly waived housing authorities' governmental immunity only up to the limits of liability insurance coverage. The HABC, acknowledging that it is a local government agency (not a state agency), argues that its functions are governmental and the immunity it thereby enjoys was waived only to the limits of its available insurance coverage. The HABC further argues that, because there is no dispute of material fact that the liability coverage it purchased was exhausted by the time Brooks filed suit, it is immune from suit. Consequently, in the view of the HABC, the court properly granted summary judgment in its favor.

## IV.

To determine which position is correct, we begin with an examination of § 1–301 of Article 44A, which is central to the disposition of this case. It provides:

An authority shall constitute a public body corporate and politic, exercising public and essential governmental functions, and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this article, including the following powers in addition to others herein granted:

(1) *To sue and be sued,* to have a seal and to alter the same at pleasure, to have perpetual succession, to make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the authority, and to make and from time to time amend and repeal bylaws, rules and regulations not inconsistent with this article, and to carry into effect the powers and purposes of the authority;

\* \* \*

(4) To make rent subsidy payments to or on behalf of persons of eligible income; to lease or rent any dwellings, houses, accommodations, lands, buildings, structures, or facilities embraced in any housing project and, subject to the limitations contained in this article, to establish and revise the rents or charges therefor; to own, hold, and improve real or personal property; to purchase, lease, obtain options upon, acquire by gift, grant, bequest, devise, or otherwise any real or personal property or interest therein; to sell, lease, exchange, transfer, assign, pledge, or dispose of any real or personal property or any interest therein; *to insure or provide for the insurance of any real or personal property or operations of the authority against any risks or hazards; to procure insurance or guarantees from the State or federal government of the payment of any debts or parts thereof (whether or not incurred by said authority) secured by mortgages on any property included in any of its housing projects;*

(5) *To invest any funds held in reserves or sinking funds, or any funds not required for immediate disbursement,* in property or securities in which savings banks may *legally invest funds* subject to their control; to *purchase its bonds* at a price not more than the principal amount thereof and accrued interest, all bonds so purchased to be canceled;

\* \* \*

(10) *To borrow money or accept grants or other financial assistance from the local, State, or federal government and accept grants from nongovernmental sources for or in aid of any housing project within its area of operation,* to take over or lease or manage any housing project or undertaking constructed, financed, or owned by the local, State, or federal government, and to these ends, to comply with such conditions and enter into such mortgages, trust indentures, leases, or agreements as may be necessary, convenient, or desirable. *It is the purpose and intent of this article to authorize every authority to do any and all things necessary or desirable to secure the financial aid or cooperation of the local, State, or federal*

*government in the undertaking, construction, mainte-nance, or operation of any housing project by such authority;* and

(11) To exercise all or any part or combination of powers herein granted.

Article 44A, § 1–301 (emphasis added).

We discussed the origins of this law in *Jackson.* We noted that the General Assembly enacted the law in anticipation of, and to take advantage of, the provisions of the United States Housing Act of 1937, ch. 896, 50 Stat. 888, now 42 U.S.C. §§ 1401–1440 (1976). *Jackson,* 289 Md. at 121, 422 A.2d at 377. The federal Act created a program designed "for slum clearance and provision for persons whose incomes are too low to enable them to live in other than insanitary or unsafe conditions." *Id.* (quoting *Matthaei v. Housing Auth. of Balti-more City,* 177 Md. 506, 509, 9 A.2d 835, 836 (1939)). By Chapter 517 of the Acts of 1937, the General Assembly added Article 44A to the Code of Public Laws. The statute adhered closely to the terms of the federal law. *Matthaei,* 177 Md. at 509–10, 9 A.2d at 836. A housing authority was created in each city having a population of over 1,000 and in each county of the state. *See* Md.Code (1937), Art. 44A, §§ 3, 4, 22; *Jackson,* 289 Md. at 121, 422 A.2d at 377. That law made each housing authority "a public body corporate and politic," but it was necessary that each local authority declare its need for a housing authority. *Jackson,* 289 Md. at 121, 422 A.2d at 377 (citations omitted).

The precise issue presented in *Jackson* was whether the Housing Opportunities Commission ("HOC") could raise the defense of governmental immunity in a personal injury action brought against it for negligence in failing to maintain the safety of the premises of a housing project. The HOC filed a preliminary motion asserting government immunity, arguing in the alternative that it was operating "as a state agency, or as a local agency exercising totally governmental functions." *Id.* at 120, 422 A.2d at 377. The plaintiffs, an injured child and his father, argued that the HOC maintained liability

insurance that constituted a recognized "exception" to the doctrine of governmental immunity. *Id.* The Circuit Court for Montgomery County granted the motion of the HOC, and the Court of Special Appeals affirmed. *Jackson v. Housing Opportunities Comm'n of Montgomery County*, 44 Md.App. 304, 317, 408 A.2d 1337, 1344 (1979).

We granted certiorari to answer "the sole question presented by the appellants[,]" which was whether the General Assembly, by enacting Article 44A, had effected "a waiver of sovereign immunity, either express or implied." *Jackson*, 289 Md. at 120, 422 A.2d at 377. To answer that question, we examined the statute, by reference to the two-pronged *Katz* test.[7] We concluded that the first prong of the *Katz* test—requiring specific legislative authority to sue the agency—was "clearly satisfied in this case. A housing authority has power '[t]o sue and be sued.' The power is unqualified." *Id.* at 124, 422 A.2d at 379. To determine whether the second prong of the *Katz* test—requiring that "funds [be] available for the satisfaction of the judgment, or power reposed in the agency for the raising of funds necessary to satisfy a recovery against it"—we looked to various provisions of Article 44A. We noted, in particular, that the statute "both authorizes and mandates the purchase of insurance" to cover "any real or personal property" or "operations of the authority" "against any risks or hazards." *Jackson*, at 127, 422 A.2d at 380–81 (citing former Art. 44A, § 8(d)). We noted, too, that the provision of insurance relating to operations, former Art. 44A, § 9, also reflected that the General Assembly contemplated that liability insurance would be purchased. We said in that regard: "The term 'insurance' as used in [former] § 9 must bear the same meaning as its use in § 8(d) and include liability insurance." *Id.* at 128, 422 A.2d at 381. Moreover, we did not "find the absence of minimum policy limits in the Housing Authorities Law to be a bar to the waiver of immunity." *Id.*

---

**7.** The version of Article 44A in force when we decided *Jackson* is, in pertinent part, substantively identical to the version of the statute we consider in the case at bar.

at 130, 422 A.2d at 382. We therefore declared our holding to be that "the combination of statutory provisions presented here effects, by necessary and compelling implication, a limited waiver of the defense of sovereign immunity to the extent of permitting recovery only out of any sum payable on behalf of the HOC by its insurer under applicable liability coverage." *Id.; see Bennett*, 359 Md. at 361, 754 A.2d at 369 (expressing the *Jackson* holding as a declaration that "Art. 44A both waived any governmental immunity which a housing authority might otherwise enjoy and capped its liability at the extent of its liability insurance").

■ Brooks, recognizing that *Jackson* undermines his argument that the General Assembly effected a complete waiver of housing authorities' immunity from suit in tort, urges us to clarify that "the limited waiver of immunity" language contained in the *Jackson* holding is *dicta*, because it is unnecessary to the resolution of the question presented in that case. We have said that, "[w]hen a question of law is raised properly by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum*, although the final judgment in the case may be rooted in another point also raised by the record." *Schmidt v. Prince George's Hosp.*, 366 Md. 535, 551, 784 A.2d 1112, 1121 (2001). Applying that standard in the recent case of *State v. Baby*, 404 Md. 220, 246, 946 A.2d 463, 478 (2008), we identified as *obiter dictum* certain language in our prior case of *Battle v. State*, 287 Md. 675, 414 A.2d 1266 (1980). We reasoned that the *Battle* language at issue was not made "on a point that was argued by counsel and deliberately addressed by this Court, but rather was a collateral statement. Most important is the fact that our decision in *Battle* was not dependent upon this statement; the holding would indeed be unaffected were that language to be removed." *Id.*

Here, as in *Battle,* the language in *Jackson* that is presently at issue was not made on a point that either party argued; albeit, unlike in *Battle,* we deliberately addressed the matter. Most important, however, is that our decision in *Jackson* was

not dependent upon our statement that the waiver of immunity is limited to the amount of insurance coverage. Moreover, the question for decision in *Jackson*, whether the statute effects any waiver of housing authority immunity, is unaffected by removal of our statement concerning the limits of the waiver.

Therefore, notwithstanding that our holding in *Jackson* includes language that Article 44A effects "a limited waiver of the defense of sovereign immunity to the extent of permitting recovery only out of any sum payable on behalf of the HOC by its insurer under applicable liability coverage," *id.* at 130, 422 A.2d at 382, that language, not being necessary to the issue to be decided in *Jackson*, is *dictum*. Even were that language not *dictum*, we would overrule it for the reasons we next discuss.

## V.

To decide whether the General Assembly's enactment of Article 44A effects a complete waiver of the HABC's governmental immunity in tort actions, as Brooks argues it does, we apply the well-recognized rules of statutory construction. Our primary goal is " 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]' " *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (quoting *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007)). We first look at the "normal, plain meaning of the language of the statute," *Anderson*, 404 Md. at 571, 948 A.2d at 18, and we read it as a whole so that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory,' " *id.* (quoting *Barbre*, 402 Md. at 172, 935 A.2d at 708). "If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." *Id.* at 572, 948 A.2d at 19. If the language can be subject to more than one interpretation, or if the terms are ambiguous when part of a larger statutory scheme, "we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law,

statutory purpose, as well as the structure of the statute." *Id.* The language should not be interpreted in isolation when the statute is part of a larger statutory scheme. *Id.* We analyze the statute as a whole considering the " 'purpose, aim, or policy of the enacting body.' " *Id.* (quoting *Serio v. Baltimore County,* 384 Md. 373, 389, 863 A.2d 952, 961 (2004)).

 Reading the relevant portions of Article 44A, we conclude that the General Assembly effected a complete waiver of the governmental immunity of housing authorities for a government function. The test for determining whether the legislature has waived a local government agency's governmental immunity (applicable only to government functions) has two conditions: "First, the Legislature must authorize suits for damages, and second, there must be provision for the payment of judgments." *Kee,* 313 Md. at 455, 545 A.2d at 1317 (summarizing the *Katz* test).

 We determined in *Jackson* that the statute readily satisfies the first condition because it authorizes housing authorities "to sue and be sued." Article 44A, § 1–301(1); *Jackson,* 289 Md. at 124, 422 A.2d at 379. We also determined in *Jackson* that Article 44A meets the condition established by the second prong of the *Katz* test because the General Assembly made provision in the statute for the payment of judgments. *Id.* at 129, 422 A.2d 376, 422 A.2d at 382. We depart, however, from our statement in *Jackson* that the waiver of immunity effected by the statute is limited by the extent of available commercial insurance coverage. Rather, an examination of the entirety of the housing authorities statute leads us to conclude that the statute effects a complete waiver of immunity, including when, as in the present case, there is no available commercial insurance coverage to satisfy the judgment.

Article 44A, § 1–301(4) authorizes housing authorities to "insure or provide for the insurance of any real or personal property or operations of the authority against any risks or hazards." Section 1–301(4) also authorizes housing authorities to "procure insurance or guarantees from the State or federal

government of the payment of any debts or parts thereof (whether or not incurred by said authority) secured by mortgages on any property included in any of its housing projects." Further, such insurance is, as we noted in *Jackson*, "mandated" by the language providing that the housing authority "shall fix the rentals" at amounts that would "meet the cost of, and to provide for, maintaining and operating the projects (including the cost of any insurance)," which, as we noted in *Jackson*, includes liability insurance. *See* 289 Md. at 127–28, 422 A.2d at 380–81 (citing former Art. 44A, § 9, recodified as Art. 44A, § 1–401).

Under § 1–301(5), moreover, housing authorities may "invest any funds held in reserves or sinking funds, or any funds not required for immediate disbursement." And, in setting rental rates, housing authorities "shall fix the rents for dwellings in its housing projects ..." at rates sufficient to "meet the cost of, and to provide for, maintaining and operating the housing projects (including the cost of any insurance) and the administrative expenses of the authority." Art. 44A, § 1–401(b)(1). Additionally, housing authorities may "borrow money or accept grants or other financial assistance from the local, State, or federal government and accept grants from nongovernmental sources for or in aid of any housing project within its area of operation[.]" Art. 44A, § 1–301(10).

The General Assembly also authorized housing authorities to "do any and all things necessary or desirable" for the construction, maintenance, or operation of any housing project. Art. 44A, § 1–301(10). Finally, housing authorities have the power to issue bonds for any corporate purpose. Art. 44A, § 1–501.

Plainly, by its enactment of Article 44A, the General Assembly expressly authorized housing authorities to satisfy judgments either by purchase of adequate insurance coverage or by self-insurance and to generate funds for that purpose through a variety of fund-raising means, without capping in any way the extent of the obligation. By application of the *Katz* test, the statute effects a complete waiver of immunity

from suit arising out of tortious conduct in the maintenance and operation of subsidized housing.

Our conclusion is bolstered by the fact that, when the General Assembly wishes to limit the waiver of governmental immunity in a given situation, it knows precisely how to do so. For example, the General Assembly requires county boards of education to carry a minimum of $100,000 comprehensive liability insurance, through commercial policies or self-insurance, and provides that the county boards "shall have the immunity from liability described under § 5–518 of the Courts and Judicial Proceedings Article." Md.Code (1978, 2008 Repl. Vol.), § 4–105 of the Education Article. Section 5–518 of the Courts and Judicial Proceedings Article, in turn, states that "[a] county board of education may not raise the defense of sovereign immunity to any claim of $100,00 or less[,]" § 5–518(c), while entitling the county boards to "raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool described under § 4–105(c)(1)(ii) of the Education Article, above $100,000." Md.Code (1973, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article ("CJP"). Similarly, the General Assembly has waived immunity for community college boards only up to insurance policy limits or $100,000 of self-insurance, and it permits the boards to "raise the defense of sovereign immunity to any amount of a claim in excess of the limit of an insurance policy or in excess of $100,000 in the case of self-insurance." CJP § 5–519. The General Assembly has done the same for the Maryland–National Capital Park and Planning Commission. *See* Md. Code (1957, 1997 Repl.Vol.), Article 28, § 2–111; CJP § 5–512 (requiring the Commission to have an "adequate" amount of insurance, and permitting the Commission to invoke the defense of government immunity for liabilities in excess of the insurance limits). Further, the General Assembly has provided that charitable organizations are not immune from tort liability, but the liability is limited to funds available under the organization's liability policy coverage. *See* Md.Code (1995, 2002 Repl. Vol.), § 19–103 of the Insurance Article.

In contrast to those statutes, the General Assembly did not expressly limit the waiver of immunity for housing authorities to either the limit of commercial insurance coverage or, in the case of self-insurance, a specific amount. We repeat, had the General Assembly wished to limit housing authorities' exposure to suits for damages, it knew how to make that limitation plain in the law.

Other states having housing authorities statutes similar to Maryland's have construed their statutes as providing a complete waiver of governmental immunity. The Supreme Court of Delaware, for example, has held that one of its local housing authority's immunity is completely waived under the operative statute. *See Wilmington Housing Auth. v. Williamson*, 228 A.2d 782, 788 (Del.1967) (superseded by statute on other grounds as stated in *Fiat Motors of N. Am. v. Wilmington*, 498 A.2d 1062 (Del.1985)). Like Article 44A, § 1–301, the Delaware statute gives the housing authority the power to " 'sue and be sued' " and " 'to insure or provide for the insurance of the property or operation of the authority against such risks as the authority may deem advisable.' " *Williamson*, 228 A.2d at 787–788 (quoting 31 Del.C. § 4307(a)(3)). The Delaware Supreme Court interpreted these clauses as waiving immunity, stating: "If immunity to suit had been intended by the General Assembly, what purpose does the grant of authority to insure its operation serve?" *Id.* at 788.

Courts from other jurisdictions have likewise recognized that similarly worded statutes completely waive housing authorities' immunity. *See, e.g., Rosa v. V.I. Housing Auth.*, 43 V.I. 131, 135–36 (Terr.Ct.2008) (citing *Greaux v. Gov.*, 14 V.I. 160 (Terr.Ct.1977)) (discussing how the housing authority's sovereign immunity was originally waived, but a subsequent amendment to the statute specifically limited the housing authority's liability to $50,000, permitting the housing authority to claim immunity from judgments over that amount); *Evans v. Housing Auth. of the City of Raleigh*, 359 N.C. 50, 602 S.E.2d 668, 672–73 (2004) (determining that the provisions of the housing authority's statute "to sue or be sued" and "to insure or provide for the insurance of the property or opera-

tions of the authority against such risks as the authority may deem advisable" waived immunity for the housing authority, but, pursuant to a separate statute, waiver of immunity was only to the extent of the amount of insurance purchased).

 For all of the reasons we have discussed, we hold that the General Assembly has waived completely the governmental immunity that Maryland's housing authorities would otherwise enjoy in tort actions arising out of the authorities' performance of government functions.[8] As a consequence, under former Article 44A (and absent any other statutory cap), a housing authority sued for tortious conduct arising out of its maintenance or operation of subsidized housing is liable for any judgment against it. To the extent that *Jackson* declares a different rule, it is hereby disavowed.

 Applying our holding to the present case, the HABC was not entitled to summary judgment on Brooks's negligence claim on the basis that it had exhausted its insurance coverage for the policy period during which that claim arose.

## VI.

 It remains for us to address Brooks's argument that the HABC cannot assert governmental immunity for the CPA claim he raises in the complaint.[9] Brooks argues that the CPA is not a tort-based statute. The only argument the HABC has for claiming immunity from suit under the CPA is that Brooks's claim is based, essentially, on the same acts as would give rise to the common law torts of fraud and negligent misrepresentation; therefore, the HABC reasons, it is entitled

---

8. Our holding obviates the need to address Brooks's contention that the functions the HABC performs in connection with its maintenance and operation of a housing project are proprietary and therefore not subject to the doctrine of governmental immunity.

9. The Court of Special Appeals summarized Brooks's CPA claim as follows: "Brooks alleged that the HABC violated the CPA by misrepresenting to potential tenants of subsidized housing units that the units were fit for human habitation when in fact, flaking and peeling lead paint made the units dangerous for children."

to the same immunity it enjoys for suits brought under common law tort actions. The Court of Special Appeals agreed with the HABC and, believing that the HABC is immune from Brooks's common law tort claim, affirmed the Circuit Court's grant of summary judgment in favor of the HABC on the CPA claim.

We recently held in *Green v. N.B.S., Inc.*, 409 Md. 528, 541, 976 A.2d 279, 286 (2009), that the statutory cap on noneconomic damages, CJP § 11–108, applies to a personal injury claim brought under the CPA. In so holding, we recognized that claims brought under the CPA can arise out of a common law tort. 409 Md. at 543, 976 A.2d at 287. We therefore reject Brooks's argument that his claim under the CPA is not tort-based.

Even though we reject Brooks's argument, we agree with him that he can sue the HABC on the grounds that it violated the CPA. The HABC presents no argument for immunity from suit under the CPA except that the HABC is immune to the same degree that it is immune from a common law tort claim. That argument fails in light of our holding that the HABC enjoys no such immunity from Brooks's common law claim. We therefore hold that the Circuit Court erred as a matter of law in granting the HABC summary judgment on the CPA claim.[10]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE FOR FURTHER PROCEEDINGS IN THAT COURT. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

---

**10.** Given our holdings, we have no need to address Brooks's contention that he presented evidence sufficient to generate a genuine dispute of material fact concerning whether the HABC had "manufactured" its immunity from suit in this case.