26 A.3d 1012

**Kevin Antoine MITCHELL**

v.

**HOUSING AUTHORITY OF BALTIMORE CITY.**

**No. 2293, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

May 25, 2011.

Reconsideration Denied Sept. 13, 2011.

180

Peter G. Byrnes (David F. Albright, Jr., Bennett & Albright PA, on the brief) Baltimore, MD, for Appellant.

J. Marks Moore, III, Baltimore, MD, for Appellee.

Panel: KRAUSER, C.J., DEBORAH S. EYLER, and JAMES P. SALMON (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Baltimore City, Kevin Antoine Mitchell, the appellant, sued the Housing Authority of Baltimore City ("HABC"), the appellee, for damages for injuries he allegedly sustained due to childhood lead paint poisoning. The HABC moved for summary judgment on the ground that neither Mitchell nor a representative had satisfied the notice

requirements of the Local Government Tort Claims Act ("LGTCA"), Md.Code (2006 Repl.Vol., 2010 Supp.), § 5–301 *et seq.* of the Courts and Judicial Proceedings Article ("CJP"), as set forth in CJP section 5–304. The circuit court granted the motion and entered judgment in the HABC's favor.

Before this Court, Mitchell challenges the judgment, posing three questions for review, which we have rephrased:

I.   Did the circuit court err in granting summary judgment because, under *Brooks v. HABC,* 411 Md. 603 [984 A.2d 836] (2009), *recon. denied,* January 8, 2010, the notice provision of the LGTCA no longer applies to claims against the HABC?

II.  If the LGTCA notice provision applies to the HABC, did the circuit court err "by failing to exercise its discretion when it did not consider facts which could constitute good cause for failure to comply with the Local Government Tort Claims Act as set forth in *Rios v. Montgomery County,* 386 Md. 104, 872 A.2d 1 (2005)"?

III. Did the circuit court err in rejecting Mitchell's argument that the HABC waived its defense under the LGTCA?

For the following reasons, we shall affirm the circuit court's judgment.

## FACTS AND PROCEEDINGS

Mitchell was born on August 18, 1987. From birth until sometime in 1990, he lived with Lovie Torain, his mother, and with his grandmother at 1011 Valley Street, in Baltimore City, in premises owned by the HABC. He alleges that, during that time, he was exposed to chipping, peeling, and flaking lead-based paint and, as a result, he suffers the effects of lead paint poisoning.[1]

---

1.  In his complaint, Mitchell also alleges exposure to lead-based paint at another property. During discovery, it was determined that that property was not owned by the HABC. The court granted summary judg-

On April 3, 1989, when he was less than two years old, Mitchell had his first recorded elevated blood-lead level.[2] He consistently tested positive for lead exposure from that point forward.

On April 3, 2008, exactly 19 years after the first test result showed he had been exposed to lead, Mitchell filed suit against the HABC for negligence and violation of the Maryland Consumer Protection Act. On April 25, 2008, the HABC answered the complaint, raising as one defense among several that Mitchell had not complied with the notice provision of the LGTCA, codified at CJP section 5–304. Discovery commenced and continued for the next 16 months.

On September 8, 2009, the HABC filed a motion for summary judgment on the ground that Mitchell had not satisfied the LGTCA notice provision. Attached to its motion were Mitchell's answers to interrogatories; Torain's deposition transcript; an affidavit by William M. Peach, III, the Director of Housing Management Administration for the HABC; and Mitchell's blood lead level records.

In his affidavit, Peach averred that the HABC first received notice of Mitchell's claim of lead paint exposure when it was served with the complaint in the instant action. Peach also averred that, due to the passage of time, the HABC no longer had a tenant folder for Mitchell's family or any records related to the 1011 Valley Street premises for the relevant time period; and the personnel working for the HABC between 1987 and 1990 no longer were employed by it. Peach attested that the HABC "has been substantially prejudiced in its ability to defend this case, because [Mitchell] failed to notify it of his claims until April of 2008."

---

ment to the HABC on that claim, a ruling that is not challenged on appeal.

**2.** Mitchell's blood lead level as reported on April 13, 1989, was 17 micrograms per deciliter ($\mu$/dL). He was tested on three occasions in 1990; on four occasions in 1991; and on one occasion each in 1992, 1993, and 1994. His blood lead level ranged between 7 $\mu$/dL and 24 $\mu$/dL in these tests.

Mitchell filed an opposition to the HABC's motion arguing, *inter alia,* that he was excused from compliance with the LGTCA under the good cause exception in CJP section 5–304(d), and that the HABC should be barred from raising the LGTCA notice defense because it waited 17 months to move for summary judgment on that basis. In support of his good cause argument, Mitchell submitted three affidavits. Dr. Aaron Zuckerberg, a pediatrician, attested that Mitchell suffers from "neuropsychological injury" and has an IQ in the "Low Average range." Mitchell and Torain both attested in separate affidavits that they had only just become aware during the pendency of the instant case of "the 'notice requirement' for the [LGTCA]."

On October 26, 2009, the circuit court heard argument on the HABC's summary judgment motion. At the conclusion of argument, the judge ruled that she was "going to grant the motion . . . because . . . the claim is barred by the [LGTCA]." An order to that effect was entered that day. Mitchell noted a timely appeal.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### *Did the Circuit Court Err in Ruling that the LGTCA Notice Requirement Applies to a Lead Paint Premises Liability Action Against a Housing Authority?*

■ Mitchell contends the Court of Appeals decision in *Brooks,* 411 Md. at 603, 984 A.2d 836, filed a little less than a month after summary judgment was granted in the instant case, "abrogate[d] [the HABC]'s protections [u]nder the [LGTCA] for its management and operation of public housing." He argues that the *Brooks* holding makes plain that the LGTCA has no application to his tort action against the HABC; therefore, he was not obligated to comply with the LGTCA's notice provision. The HABC responds that *Brooks*

"did not involve the LGTCA at all, much less the [s]ection 5–304 notice requirement" and therefore its holding did not effect any change in the protections the HABC is afforded under the LGTCA.

We note that the HABC does not argue that the question of the effect of the *Brooks* decision on the applicability of the LGTCA was not raised below, and therefore is not properly before this Court for review. Of course, that precise question could not have been raised below, as *Brooks* had not been decided. Nevertheless, in the hearing on the HABC's motion for summary judgment, counsel for Mitchell argued generally that the LGTCA should not apply to premises liability lead paint cases against the HABC. The court rejected that argument, stating that, if that were to be the case, it would be the function of the Court of Appeals, not the circuit court, to so hold. Thus, the court below addressed the general question whether the LGTCA applied to the case at bar, even though *Brooks* had yet to be decided. We consider the issue to be preserved for review under Rule 8–131(a).

### State Sovereign Immunity and Immunity of Local Governments in Maryland

The common law doctrine of sovereign immunity from suit applies to the State, including its agencies and instrumentalities. *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 507–08, 397 A.2d 1027 (1979). "Although originally based on the tenet that 'the King can do no wrong,' the doctrine is presently viewed as a rule of policy which protects the State from burdensome interference with its governmental functions and preserves its control over State agencies and funds." *Id.* at 507, 397 A.2d 1027. The doctrine applies "unless the General Assembly has waived the immunity either directly or by necessary implication." *Id.* at 507–08, 397 A.2d 1027. However, "a legislative waiver of sovereign immunity is ineffective unless specific legislative authority to sue the agency has been given, and unless there are funds available for the satisfaction of the judgment, or power re-

posed in [an] agency for the raising of funds necessary to satisfy recovery against it." *Id.* at 513, 397 A.2d 1027.

Unlike the State, local governments (*i.e.*, counties, municipalities, and their agencies) do not have from their inception broad common law immunity from suit. Indeed, "[u]ntil the twentieth century, local governments generally had no immunity under Maryland common law in either tort or contract actions." *HABC v. Bennett*, 359 Md. 356, 358, 754 A.2d 367 (2000). At that time, the Court of Appeals adopted as the common law of Maryland partial immunity from liability in tort for local governments, based upon the nature of the conduct at issue. *Austin v. City of Baltimore*, 286 Md. 51, 53, 405 A.2d 255 (1979). Specifically, the Court held that when local governments are engaged in activities that are "governmental" in nature, they are immune from tort liability based on those activities. When local governments are engaged in activities that are "proprietary" or "private" in nature, they do not enjoy immunity from tort liability based on those activities. *Bennett, supra*, 359 Md. at 359, 754 A.2d 367. Irrespective of the nature of the conduct in which local governments are engaged, they have no judicially-conferred or common law immunity from liability for certain types of torts, such as nuisance, or for state or federal constitutional torts or torts based on federal statutory violations. *Id.*[3]

### Housing Authorities in Maryland.

On September 1, 1937, Congress enacted the United States Housing Act ("Housing Act"), establishing a federal housing program for the purpose of clearing slums and replacing them with low income public housing projects. Act of 1937, ch. 896, 50 Stat. 888 (now codified at 42 U.S.C. § 1401, *et seq.*) Even before the Housing Act was passed, it was understood that, when enacted, it would provide funding for states that estab-

---

**3.** Local governments still do not have any common law immunity from liability in contract. *Bennett*, 359 Md. at 358–59, 754 A.2d 367. *See also BEKA Industries, Inc. v. Worcester County Board of Education*, 419 Md. 194, 212 n. 12, 18 A.3d 890 (2011).

lished their own conforming housing laws. In anticipation of the Housing Act, the Maryland General Assembly, by chapters 517 and 518 of the Acts of 1937, enacted a housing law that established a state-wide policy for public housing and provided that counties and Baltimore City could create housing authorities ("Housing Authorities Law."). *See Matthaei v. HABC*, 177 Md. 506, 509, 9 A.2d 835 (1939).

The Housing Authorities Law initially was codified in Article 44A of the Maryland Code. In 2006, it was recodified to Titles 12 through 23 of the Housing and Community Development Article ("HCD"), which comprise "Division II" of that Article.

### Jackson v. Housing Opportunities Commission of Montgomery County (1980)

Whether housing authorities established under the Housing Authorities Law are immune from liability in tort, and if so, to what extent, first was addressed by the Court of Appeals in *Jackson v. Housing Opportunities Commission of Montgomery County*, 289 Md. 118, 422 A.2d 376 (1980).

Pursuant to the Housing Authorities Law, Montgomery County established a local housing authority known as the Housing Opportunities Commission ("HOC"). In 1978, the parents of a child who lived in a public housing project operated by the HOC sued it, upon allegations that its negligence in failing to properly maintain an outside stair rail had caused their child to sustain personal injuries. The circuit court held that the HOC was immune from liability in tort, and this Court affirmed. 44 Md.App. 304, 408 A.2d 1337 (1979). We held that the HOC is a State agency and therefore enjoys sovereign immunity, and that the Housing Authorities Law did not expressly or by necessary implication waive the HOC's immunity from tort liability.

The Court of Appeals granted *certiorari* and reversed in part. It noted that the HOC had advanced two, alternative, arguments: first, that it was a State agency, entitled to sovereign immunity from tort liability; and second, that it was

an agency of a local government (Montgomery County) that acted in a "governmental" as opposed to a private or proprietary capacity in operating public housing projects, and therefore was entitled to local governmental immunity from tort liability with respect to the activities on which the suit against it was based. The Court decided that it was not necessary to decide whether the HOC was a State agency or a local governmental agency, as the answer to that question would not affect its analysis of the issue before it.

The *Jackson* Court applied the two-pronged test established in *Katz, supra,* 284 Md. at 503, 397 A.2d 1027, to the Housing Authorities Law to determine whether the General Assembly specifically had authorized housing authorities to be sued; and, if so, whether funds were available to satisfy a judgment against a housing authority or the Housing Authorities Law permitted funds to be raised when necessary to satisfy a judgment against a housing authority.

The Court held that the first prong easily was satisfied by language in the Housing Authorities Law authorizing a housing authority to "sue or be sued." *See* section 8(a) of former Art. 44A. Turning to the second prong, the Court noted that the Housing Authorities Law permitted housing authorities to purchase liability insurance, but did not establish minimum policy limits. On that basis, it concluded that the Housing Authorities Law effected a "limited waiver of the defense of sovereign immunity to the extent of permitting recovery only out of any sum payable on behalf of [a housing authority] by its insurer under applicable liability coverage." 289 Md. at 130, 422 A.2d 376.

In *Bennett,* the Court of Appeals summarized its holding in *Jackson* as follows:

In determining whether the housing authority ... was entitled to the defense of governmental immunity, we construed various sections of Art. 44A as effecting a limited waiver of any governmental immunity which the housing authority might otherwise enjoy. Separate provisions of Article 44A authorized housing authorities to sue and to be

sued, mandated that no judgments against housing authorities could be executed against real property owned by the authorities, required the authorities to purchase liability insurance coverage for their operations against any risks or hazards, and directed the authorities to include the cost of such liability insurance in their operating costs to be covered by the rents they charged. Considering these statutory provisions together, this Court held that, "by necessary and compelling implication," Art. 44A effected a waiver of the defense of governmental immunity, but only to the extent of the "applicable limits" of a housing authority's liability insurance policy.... In other words, Art. 44A both waived any governmental immunity which a housing authority might otherwise enjoy and capped its liability at the extent of its liability insurance.

359 Md. at 360–61, 754 A.2d 367 (quoting *Jackson*, 289 Md. at 130, 422 A.2d 376).

### The LGTCA Generally

The General Assembly enacted the LGTCA, effective July 1, 1987. Acts of 1987, ch. 594. The LGTCA "affected the tort liability of local governments in several ways." *Bennett*, 359 Md. at 361, 754 A.2d 367. It repealed prior legislation that had placed monetary caps on waivers of governmental immunity by charter counties and had imposed notice requirements for certain claims against counties or municipalities; defined local governments; adopted damages caps in tort actions; and imposed notice requirements that were "essentially the same notice requirements which had existed under the prior law which was repealed" by the legislation enacting the LGTCA. *Id.* at 362–63, 754 A.2d 367.

In 1988, the General Assembly amended the LGTCA to add to the definition of "local government" what is now termed "[h]ousing authorities created under Division II of the [HCD] Article." CJP § 5–301(d)(15). The HABC is such a housing authority. Thus, like many of the other entities on the list of "local governments" in the LGTCA, the HABC, while not a government, is considered a "local government" for

purposes of the LGTCA. *See Baltimore Police Dept. v. Cherkes,* 140 Md.App. 282, 323–26, 780 A.2d 410 (2001) (holding that the Baltimore Police Department, which is a State agency, is treated as a "local government" for purposes of the LGTCA as it is listed in CJP section 5–301 as a "local government").

" '[T]he purpose of the LGTCA is to "provide a remedy for those injured by local government officers and employees acting without malice and in the scope of employment." ' " *Rios, supra,* 386 Md. at 125, 872 A.2d 1 (quoting *Faulk v. Ewing,* 371 Md. 284, 298, 808 A.2d 1262 (2002) (in turn, quoting *Moore v. Norouzi* ). "The [LGTCA] affords a remedy to those injured by acts of local government officers and employees, while 'ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.' " *Id.* at 126, 872 A.2d 1 (quoting *Ashton v. Brown,* 339 Md. 70, 108, 660 A.2d 447 (1995)). In keeping with these purposes, the LGTCA, in its current form, requires local governments to provide a defense for employees sued for "tortious acts or omissions committed ... within the scope of employment." CJP § 5–302(a). It further caps a local government's liability at "$200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions." CJP § 5–303(a)(1).

### The LGTCA Notice Requirement

In enacting the LGTCA, the legislature repealed and replaced a notice of claim requirement, then codified at Md.Code (1984 Repl.Vol., 1986 Supp.) section 5–306 of CJP. It included in the LGTCA a similarly-worded notice requirement. The new notice requirement expanded its reach, however, to apply to all "local governments" as defined under the Act. *See Williams v. Maynard,* 359 Md. 379, 381, 754 A.2d 379 (2000) (stating that the pre-existing notice requirement was an independent statute that applied only to actions against counties and municipal corporations). The previous notice requirement

had existed in Maryland law since 1941 in various forms and with varying applicability. *Id.* at 389, 754 A.2d 379.

The LGTCA notice requirement states, in pertinent part, that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury." CJP § 5–304(b). The requirement may be waived, however, "upon motion and for good cause shown," unless the local government makes an affirmative showing "that its defense has been prejudiced by lack of required notice." *Id.* at § 5–304(d).

The *Rios* Court described the purpose and effect of the LGTCA notice requirement as follows:

The notice requirement of Sections 5–304(a) and (b) are intended to apprise a local government "of its possible liability at a time when it could conduct its own investigation, *i.e.,* while the evidence was still fresh and the recollection of the witnesses was undiminished by time, 'sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.'" *Faulk,* 371 Md. at 298–99, 808 A.2d at 1272, quoting *Williams v. Maynard,* 359 Md. 379, 389–90, 754 A.2d 379, 385 (2000), quoting in turn *Jackson v. Bd. of County Comm'rs,* 233 Md. 164, 167, 195 A.2d 693, 695 (1963). We have expressly held that the LGTCA notice requirements are a condition precedent to maintaining an action against a local government or its employees to the extent otherwise not entitled to immunity under the LGTCA. *Faulk,* 371 Md. at 304, 808 A.2d at 1276; *Grubbs v. Prince George's County,* 267 Md. 318, 320– 21, 297 A.2d 754, 755–56 (1972) (stating "we have regarded it [the predecessor statute to the LGTCA, Md.Code (1957, 1972 Repl.Vol.), Art. 57, § 18] as a condition precedent to the right to maintain an action for damages"); *see also Neuenschwander v. Washington Suburban Sanitary Comm'n,* 187 Md. 67, 77, 48 A.2d 593, 599 (1946) (stating that "the notice is a condition precedent to the right to maintain the suit"), *overruled on other grounds by statute as stated in Arnold v. Prince George's County,* 270 Md. 285,

311 A.2d 223 (1973); *Leppo v. State Highway Admin.*, 330 Md. 416, 423, 624 A.2d 539, 542 (1993) (interpreting a statutory notice requirement in the Maryland Tort Claims Act to be a condition precedent to institution of a third-party action against the State); *Redfern v. Holtite Mfg. Co.*, 209 Md. 106, 111–12, 120 A.2d 370, 372–73 (1956) (finding that statutory notice was a condition precedent to applying for payment for deaths pursuant to the Workmen's Compensation Act).

386 Md. at 126–27, 872 A.2d 1.

### *HABC v. Bennett (2000) and the 2001 Emergency Amendment to the LGTCA*

In *HABC v. Bennett, supra,* also a lead paint case, the Court was presented with "the single issue ... whether the LGTCA's damages cap provision limits the liability of a local government in a tort action in which the local government itself is a defendant and is subject to a limited waiver of immunity effected by an enactment of the General Assembly which is separate and distinct from the LGTCA." 359 Md. at 363–64, 754 A.2d 367 (footnote omitted). The case was tried before a jury which returned a verdict of $630,000 in favor of the plaintiff. The trial court reduced the verdict to $200,000, on the ground that it was capped at that amount by the LGTCA, specifically, CJP section 5–303(a).

In a motion to alter or amend, the plaintiff argued that the LGTCA's cap on damages applied only to judgments against employees of local governments for which local governments are liable under the LGTCA, not judgments against the local governments themselves. The plaintiff further argued, based on *Jackson,* that because (at that time) a housing authority's liability in tort was limited to the amount of its available insurance, under the *Jackson* Court's interpretation of the Housing Authorities Law, she was entitled to a limited reduction of the verdict to $500,000, which was the amount of the liability insurance coverage she asserted was available to the HABC. The circuit court granted the motion in part, reducing the judgment to $350,000, on the ground that the verdict was

not capped by the LGTCA but was capped by the amount of the HABC's available liability insurance within the cap for non-economic damages established in CJP section 11–108(b). The HABC then filed a motion to alter or amend on the ground that the limit of its available liability insurance actually was less than $350,000. The court denied the motion.

The case eventually came before the Court of Appeals. The Court analyzed the language of Md.Code (1998 Repl.Vol.) of CJP section 5–303(a), which at that time read, in relevant part:

The liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, *including* liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

(Emphasis added.) Subsection (b) of CJP section 5–303 stated then, and still states, that except as provided in subsection (c)—which addresses punitive damages—"a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment," and "[a] local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection." CJP § 5–303(b)(1) and (2), respectively.

Focusing on the word "including" in CJP section 5–303(a), the *Bennett* Court held that the LGTCA damages cap does not apply "to tort actions directly against local governments when the bases for such actions are enactments of the General Assembly, state common law, the state constitution, or federal law," as opposed to tort actions authorized by "locally enacted ordinances or charter provisions." 359 Md. at 373–74, 754 A.2d 367. The Court pointed out that the only language of the LGTCA addressing liability of a local government itself, as opposed to a local government's obligation to pay damages awarded against one of its employees, is found in the notice provision, then codified at CJP section 5–304(a), now codified

at CJP section 5–304(b), which states: " '. . . an action for unliquidated damages may not be brought *against a local government or its employees* unless the notice of the claim required by this section is given within 180 days after the injury.' " *Id.* at 371, 754 A.2d 367 (emphasis in *Bennett.*) The Court observed that "when the General Assembly intended a provision of the LGTCA to apply to actions against employees *or* actions against local governments, it knew how to say so." *Id.* (emphasis in *Bennett* ).

The Court of Appeals opinion in *Bennett* was filed on June 6, 2000. By emergency passage of HB 942, which was cross-filed as SB 433, the General Assembly amended CJP section 5–303(a) to undo the holding in *Bennett,* by making clear that the damages cap in the LGTCA applies to actions brought directly against local governments (which, as explained, include housing authorities). Ch. 286, Acts of 2001 (effective April 20, 2001). HB 942 eliminated the word "including" from then CJP section 5–303(a) and replaced it with the word "or." [4]

---

4. The Bill Analysis for HB 942 states in relevant part:

This emergency bill clarifies that the monetary limits on the liability of a local government under the [LGTCA] apply to tort actions against a local government itself, as well as to actions against local government employees.

\* \* \*

This bill is in response to [the *Bennett* decision], which held that the limits on liability under the LGTCA do not apply to a tort judgment directly against a local government agency. In reaching its decision, the court found the word "including" in [former] § 5–303(a)(1) to be ambiguous and concluded that "[i]n the context of the LGTCA, we do not believe that the monetary limitation, by use of the word 'including' with reference to liability for judgments against employees, should be construed as also applying to *all* tort judgments directly against local governments and agencies regardless of the basis for such judgments."

According to the Maryland Association of Counties and the Maryland Municipal League, the Court of Appeals decision was contrary to the commonly understood meaning of § 5–303 and ignored the rule of statutory interpretation in Article 1, § 30 of the Code, which defines "includes" or "including" to mean, unless the context requires otherwise, includes or including by way of illustration and not by way of limitation.

Chapter 286 states that the amended law applies to cases pending on the effective date of this Act and arising from events occurring on or after July 1, 1987." That date was the effective date of the LGTCA.

### Brooks v. HABC (2009)

In *Brooks*, the Court of Appeals revisited and ultimately overruled the holding in *Jackson* that the Housing Authorities Law effected only a partial waiver of immunity for tort liability of housing authorities.

Devonte Brooks, a minor child, acting through his mother, sued the HABC for negligence and violations of the Maryland Consumer Protection Act arising from his exposure to lead-based paint, allegedly at a property owned by the HABC. By the time Brooks filed suit, the HABC's liability insurance coverage for the period in question had been exhausted. The HABC moved for summary judgment, arguing, under *Jackson*, that its immunity to suit was waived only to the limits of its insurance coverage, and because it no longer had any insurance coverage applicable to Brooks, it was immune. The circuit court granted summary judgment in favor of the HABC and, in an unreported opinion, this Court affirmed. The Court of Appeals granted *certiorari* to decide "whether the [HABC] enjoys governmental immunity from suits in tort if it has exhausted the limits of its commercial insurance policy in payment of prior claims." 411 Md. at 607, 984 A.2d 836.

The *Brooks* Court deemed the portion of the *Jackson* opinion addressing the second *Katz* factor *dictum* and conducted its own analysis of the Housing Authorities Law under the *Katz* test. It concluded, as had the *Jackson* Court, that

By changing the word "including" to "or" in [former] § 5–303(a)(1), the bill seeks to clarify that the limits on liability do apply to tort judgments directly against local governments and agencies.
Bill Analysis, House Judiciary Committee, HB 942, at 1–2 (quoting *Bennett*, 359 Md. at 373, 754 A.2d 367). *See also Board of County Comm'rs v. Marcas*, 415 Md. 676, 684, 4 A.3d 946 (2010) Floor Report, Senate Judicial Proceedings Committee, SB 433 (2001) (explaining that Chapter 286 was enacted to clarify existing law).

that statute clearly satisfies the first prong of the *Katz* test. As to the second prong, the Court reasoned that, in addition to mandating that housing authorities purchase liability insurance, the Housing Authorities Law also provides numerous means for housing authorities to raise funds that can be used to satisfy judgments against them, including setting rents for housing projects; issuing bonds; investing funds; and borrowing money and receiving grants. The Court noted, moreover, that, although the legislature has on many occasions enacted statutes expressly waiving governmental immunity in tort only up to the limits of available insurance coverage, no such language appears in the Housing Authorities Law. Finally, the Court looked to decisions from other states construing housing authorities statutes similar to Maryland's as effecting a complete waiver of governmental immunity.

The *Brooks* Court stated:

> For all of the reasons we have discussed, we hold that the General Assembly has waived completely the governmental immunity that Maryland's housing authorities would otherwise enjoy in tort actions arising out of the authorities' performance of government functions. As a consequence, under former Article 44A (and absent any other statutory cap), a housing authority sued for tortious conduct arising out of its maintenance or operation of subsidized housing is liable for any judgment against it. To the extent that *Jackson* declares a different rule, it is hereby disavowed.

*Id.* at 626, 984 A.2d 836 (footnote omitted). The Court's holding determined, implicitly, that the immunity housing authorities would have, absent waiver by legislation, is the immunity of local governments when acting in performance of governmental functions, including maintaining and operating subsidized housing. *Cf. Rios,* 386 Md. at 130, 872 A.2d 1 (holding that a county operated hospital providing subsidized health care to the poor is the agency of a local government that is acting in a governmental, as opposed to a proprietary, capacity).

The HABC moved for reconsideration of the decision in *Brooks,* asking, *inter alia,* that the Court clarify that the LGTCA's "statutorily-mandated limits on liability" still would apply in any action against it. It asserted that plaintiffs in the circuit court and one plaintiff/appellant in a case pending in this Court already were arguing that the limits of liability established by the LGTCA no longer were applicable to housing authority "local governments" and, therefore, the Court of Appeals should address this issue. The Court of Appeals denied the motion by line order.

### *Prince George's County v. Longtin (2011)*

In *Prince George's County v. Longtin,* 419 Md. 450, 19 A.3d 859 (2011), a plaintiff sued Prince George's County for a number of torts arising out of his being charged with the rape and murder of his wife and incarcerated even after the prosecution had obtained conclusive DNA evidence exonerating him. As pertinent to the case at bar, the Court of Appeals held: 1) that the 180–day time period for the plaintiff to give notice of his claims under the LGTCA began to run when he was released from incarceration, which meant that notice was timely given; and 2) the emergency legislation enacted effective April 20, 2001, in response to the Court's decision in *Bennett,* could not apply retroactively to the July 1, 1987 enactment date of the LGTCA for causes of action that had accrued before April 20, 2001, because a plaintiff has a "vested right" to a complete recovery in a fully accrued cause of action that the General Assembly cannot take away, by means of a cap on damages, without violating the plaintiff's Maryland constitutional rights.

### *Analysis*

As noted, it is Mitchell's contention that the holding in *Brooks* compels the conclusion that, even though housing authorities are "local government" entities under the LGTCA, the LGTCA no longer applies to tort actions against them, and therefore the notice provision of the LGTCA no longer applies to tort actions against them. He maintains that the Court's

denial of the HABC's motion for reconsideration in *Brooks* buttresses his argument. We disagree.

The LGTCA was not at issue in *Brooks*. *Brooks* addressed only the extent of the Housing Authorities Law's waiver of the governmental immunity that housing authorities otherwise would enjoy. The *Brooks* Court made no reference to the LGTCA and did not discuss *Bennett* or any cases applying the LGTCA in the context of lawsuits against housing authorities. The HABC's motion for reconsideration in *Brooks* was, in effect, a plea to the Court to address an issue that, although likely to arise in a subsequent case, was not before the Court in that case. As it is unlikely that the Court would address on a motion for reconsideration an issue not raised by the case under consideration and not the subject of its grant of *certiorari*, we decline to ascribe any meaning, for purposes of the instant case, to the *Brooks* Court's denial of the motion for reconsideration.

As discussed above, since 1988, a housing authority such as the HABC has been a defined "local government" in the LGTCA (CJP section 5–301(d)(15)). Moreover, as the *Bennett* Court pointed out, the language of the notice provision of the LGTCA (CJP section 5–304) is plainly written and clearly states that "an action for unliquidated damages may not be brought against a local government *or* its employees unless the notice of the claim required by this section is given within 180 days after the injury." *Bennett, supra,* 359 Md. at 371, 754 A.2d 367. (Emphasis added.) Thus, prior to the Court of Appeals decision in *Brooks,* the law was clear that compliance with the notice requirement of the LGTCA was a condition precedent to bringing a tort action for unliquidated damages against a housing authority, such as the HABC.

Unlike the damages cap provision of the LGTCA, which has been subject to differing interpretations by the Court of Appeals and the General Assembly, the LGTCA's notice provision uniformly has been understood by the Court of Appeals and the General Assembly to apply to tort actions for money damages brought directly against local government entities.

*Compare Bennett,* 359 Md. at 371, 754 A.2d 367 (observing that the legislature made clear that the LGTCA's notice provision applies to direct actions against local governments when it did not make clear that such actions were subject to the LGTCA's damages cap) and *Longtin,* 419 Md. 450, 19 A.3d 859 (holding implicitly that the notice provision of the LGTCA applies to a cause of action against a local government even when the damages cap provision of the LGTCA does not). And that was the case throughout the period of time when, under *Jackson,* the Housing Authorities Law was thought to have effected a partial waiver of the governmental immunity housing authorities otherwise enjoyed.

The question, then, is whether the Court of Appeals holding in *Brooks* that the waiver of governmental immunity enjoyed by housing authorities is complete, not partial, produces a change in the settled law so that the notice requirements in CJP section 3–304(b)(1) no longer are condition precedents to bringing suit against a housing authority for damages in tort. The Court of Appeals decision in *Williams v. Maynard,* 359 Md. at 379, 754 A.2d 379, offers direct guidance on this question.

Williams was involved in an automobile accident with a vehicle owned by Montgomery County ("the County") and operated by Maynard, a County employee. Williams's vehicle was damaged and he sustained personal injuries. Within a month of the accident, Williams, through counsel, filed a written claim with the claims supervisor for the claims administrator for the County. Settlement negotiations with the claims administrator failed and, more than two years after his accident, Williams brought suit in the circuit court against Maynard and the County.

The County moved to dismiss Williams's complaint, arguing that he had not complied with the notice requirement of the LGTCA because he did not give notice of his claim to the County Executive within 180 days of the accident. Williams responded, *inter alia,* that the notice requirement of the LGTCA

was not applicable to the statutory waiver of governmental immunity effected by § 17–107(c) of the Transportation Article [ ("Trans.") ] and [CJP] § 5–524[ ], and that, insofar as [the] County was liable under [those statutes] as owner of the vehicle driven by Maynard, the County's governmental immunity had been waived to the extent of the required security which it had provided to the Motor Vehicle Administration pursuant to [Trans.] § 17–103.

*Id.* at 385, 754 A.2d 379. Under Trans. section 17–107(c), an owner or lessee of a vehicle registered under Maryland law may not raise the defense of sovereign or governmental immunity under CJP section 5–524 to the extent of the security, i.e., required minimum automobile liability coverage, mandated by Title 17 of the Transportation Article.[5] *See Edwards v. Mayor & City Council,* 176 Md.App. 446, 466–67, 933 A.2d 495 (2007) (explaining that Trans. section 17–107(c) waives the defense of governmental immunity "with respect to the mandatory security that must be maintained by owners or lessees of registered motor vehicles pursuant to Trans. [ ] § 17–103(b)"). The circuit court rejected this argument and dismissed Williams's action against the County. On appeal, this Court affirmed.

The Court of Appeals granted *certiorari* on the single question whether the LGTCA notice provision applies to a tort action against a local government authorized by Trans. section 17–107(c) and CJP section 5–524. After reviewing the history of a notice requirement that had preexisted enactment of the LGTCA; the history of the enactment of the LGTCA notice provision; and the purposes of the LGTCA notice provision, as

---

**5.** CJP section 5–524 states:

An owner or lessee of any motor vehicle registered under Title 13 of the Transportation Article may not raise the defense of sovereign or governmental immunity, to the extent of benefits [i.e., required minimum automobile liability insurance coverage] provided by the security accepted by the Motor Vehicle Administration under § 17–103 of the Transportation Article, in any judicial proceeding in which the plaintiff claims that personal injury, property damage, or death was caused by the negligent use of the motor vehicle while in government service or performing a task of benefit to the government.

discussed above, the Court opined that the LGTCA notice provision has been applied "broadly to a variety of tort actions, including actions authorized by a statutory waiver of governmental immunity." *Id.* at 390, 754 A.2d 379. Moreover, "[t]he plain language of § 5–304 of the LGTCA indicates a legislative intent to make the notice requirement broadly applicable to tort actions brought directly against local governments." *Id.* at 391, 754 A.2d 379.

The *Williams* Court also addressed and rejected the argument that case law interpreting the notice provision of the Maryland Tort Claims Act ("MTCA"), Md.Code (2009 Repl. Vol., 2010 Supp.), sections 12–101 *et seq.* of the State Government Article ("SG"), should control.[6] In *State v. Harris*, 327 Md. 32, 607 A.2d 552 (1992), the plaintiff was injured in an automobile accident with a vehicle owned by the State and driven by a State employee. He filed an automobile tort action in the circuit court without complying with the notice requirement of the MTCA. His suit was dismissed for that reason. Ultimately, the Court of Appeals held that the plaintiff could bring his automobile tort action against the State and its agent under Trans. section 17–107(c) and CJP section 5–524 independent of the requirements of the MTCA, including the MTCA's notice requirement.

In holding that *Harris* was not controlling, the *Williams* Court emphasized that "the relationship between the [MTCA] and other statutes waiving the State's sovereign immunity is quite different from the relationship between the LGTCA and statutes waiving local governmental immunity." 359 Md. at 394–95, 754 A.2d 379. As we have explained, the State and its agencies and instrumentalities are immune from tort liability

---

6. The notice requirement under the MTCA appears at SG section 12–106. It provides in subsection (b):

   *Claim and denial required.*—A claimant may not institute an action under this subtitle unless:

   (1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;

   (2) the Treasurer or designee denies the claim finally; and

   (3) the action is filed within 3 years after the cause of action arises.

unless that immunity is waived by an Act of the General Assembly and there are funds available to pay a judgment. *Katz, supra,* 284 Md. at 513, 397 A.2d 1027. The MTCA is one Act of the General Assembly that waives State sovereign immunity; and certain actions may be brought against the State and its agencies and instrumentalities pursuant to that Act. There are other Acts of the General Assembly, including Trans. section 17–107(c) and CJP section 5–524, that also constitute waivers of State sovereign immunity. The *Williams* Court explained that *Harris* merely recognized that the plaintiff in that case could bring a tort action under the MTCA or could bring a more limited tort action under Trans. section 17–107(c) and CJP section 5–524. The plaintiff's failure to comply with the notice requirement of the MTCA foreclosed his suit under that Act, but did not prevent him from suing pursuant to the other statutes.

The *Williams* Court drew a distinction between the waiver by the MTCA and other statutes effecting a waiver of what otherwise would be the complete immunity of the State and immunity waivers applicable to local governments, which only have whatever immunities they enjoy by virtue of Acts of the General Assembly or judicial decision. According to the *Williams* Court, unlike the MTCA, which itself waives the immunity of the State for some tort claims, the LGTCA "does not waive governmental immunity or otherwise authorize any actions directly against local governments." *Id.* at 394, 754 A.2d 379. Therefore, the LGTCA notice requirement "could have no effect if [it] did not extend to actions authorized by law other than the LGTCA." *Id.*

Reading *Brooks* in conjunction with *Williams,* we are persuaded that the LGTCA notice requirement applies to a claim brought against a housing authority, such as the HABC, that is within the definition of a "local government" in the LGTCA. "Housing authorities" established locally under the Housing Authorities Law are agencies of local governments that, absent any waiver, would enjoy immunity from tort liability for their governmental actions of operating and maintaining public housing. The legislation that waived that immunity is the

same legislation that authorized local governments to create housing authorities—the Housing Authorities Law—and it is pursuant to that legislation that Mitchell was authorized to sue the HABC in tort. The LGTCA establishes the procedural framework for the actions that may be brought against local government entities where immunity from tort liability for governmental actions has been waived. It also aids recovery by plaintiffs in such suits, by imposing responsibilities upon local governments to pay certain judgments against their employees, and protects local governments economically by placing dollar limitations on the judgments for which they are responsible. The critical point, for our purposes, is that the LGTCA is not immunity-waiving or action-authorizing legislation.

The issue in *Brooks* was confined to whether the Housing Authorities Law effected a partial or complete waiver of a housing authority's governmental immunity; and the holding in *Brooks* simply is that the immunity waiver is complete, not partial (*i.e.*, not capped at the level of the housing authority's liability insurance coverage). The holding that the legislation that allows housing authorities to be held liable in tort at all waives their governmental immunity completely, not partially, does not concern the LGTCA as the procedural vehicle for bringing tort actions against a housing authority, and in particular the requirement, under the LGTCA, that notice be given as spelled out in that statute.

Accordingly, the LGTCA's 180–day notice requirement, as set forth in CJP section 5–304, applied to Mitchell's tort action against the HABC before *Brooks* was decided, and after. The circuit court did not err in ruling that the notice provision of the LGTCA applied to Mitchell's tort action, and in basing its grant of summary judgment in favor of the HABC on Mitchell's failure to comply with the LGTCA's notice requirements.

## II.

### *Good Cause/Prejudice*

As already mentioned, the notice requirements of the LGTCA are set forth in subsection (b) of section 5–304.

Subsection (d) of that statute allows for a good cause waiver of the notice requirements, except when that would result in prejudice to the defendant:

> Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given.

Thus, there are two prongs to a subsection (d) waiver. When a plaintiff in a tort action against a local government has not satisfied the notice requirements enumerated in CJP section 5–304(b), the court has discretion to waive the notice requirements upon a showing of good cause. However if good cause is shown, there can be no waiver if the defendant makes an affirmative showing that its defense has been prejudiced by the plaintiff's failure to comply with the notice requirements. *Longtin,* 419 Md. at 467–68, 19 A.3d 859.

The parties agree that, if the notice provision of the LGTCA applies to Mitchell's tort action (which we have held it does), Mitchell failed to satisfy its requirements.

In his second contention on appeal, Mitchell argues that the circuit court abused its discretion by not giving any consideration to the evidence he presented on good cause. He urges that the judge's comments during the summary judgment hearing reveal not only a failure on her part to consider his good cause evidence but also a failure to consider the impact of the Court of Appeals decision in *Rios,* 386 Md. 104, 872 A.2d 1, on the good cause analysis. He maintains that the judge's failure to exercise discretion was itself an abuse of discretion. He also maintains, in one sentence in his brief, that the evidence he presented of his and Torain's ignorance of the notice requirements and of his brain damage in combination constituted good cause *per se.* We find no merit in Mitchell's arguments.[7]

---

7. We note that in his opening brief Mitchell does not advance any argument on the issue of prejudice under CJP section 5–304(d). As we

As mentioned, the notice requirements of the LGTCA are a condition precedent to bringing a tort action against a local government or one of its employees. *Faulk, supra,* 371 Md. at 304, 808 A.2d 1262. "The question of whether good cause for a waiver of a condition precedent exists is clearly within the discretion of the trial court." *Rios,* 386 Md. at 121, 872 A.2d 1. An abuse of discretion exists when " 'no reasonable person would take the view adopted by the [trial] court[ ]' . . . or when the court acts 'without reference to any guiding rules or principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court[ ]'. . . or when the ruling is 'violative of fact and logic.' " *Wilson v. John Crane, Inc.,* 385 Md. 185, 198, 867 A.2d 1077 (2005), (quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13, 701 A.2d 110 (1997)).

"The failure to exercise discretion when its exercise is called for is an abuse of discretion." *Johnson v. State,* 325 Md. 511, 520, 601 A.2d 1093 (1992). Likewise, discretion cannot be said to have been soundly exercised " 'which wholly disregarded evidence by which its exercise should have been aided.' " *Isley v. State,* 129 Md.App. 611, 647, 743 A.2d 772 (2000), *overruled in part on other grounds, Merritt v. State,* 367 Md. 17, 24, 785 A.2d 756 (2001) (quoting *Washington,*

---

have explained, even if a plaintiff succeeds in persuading a circuit court to exercise its discretion to find good cause for the failure to comply with the notice requirements of that statute, the court cannot waive the requirements and have the case proceed if the defendant affirmatively shows that its defense has been prejudiced by lack of required notice. The HABC argued both absence of good cause and prejudice, and the court's ruling did not confine its decision only to good cause. Thus, even if Mitchell's arguments on good cause were persuasive, he has not challenged, in his opening brief, the prejudice prong of the waiver statute. In his reply brief, however, he states, "HABC adds to its argument [in its brief] that it was prejudiced by a lack of notice. However, there was never (beyond a legal conclusion in an affidavit) any facts presented to suggest prejudice, much less a finding of same by the [c]ourt" and argues that any prejudice was caused by the HABC not keeping records for a long enough retention period.

*Baltimore & Annapolis Railroad Co. v. Kimmey,* 141 Md. 243, 250, 118 A. 648 (1922)).

The most recent holding by the Court of Appeals on the issues of good cause and prejudice under the notice provision of the LGTCA is *Rios,* which was decided in 2005.[8] In that case, an infant suffered a serious birth injury upon delivery by a doctor employed by Montgomery County ("County").[9] Almost ten years later, the infant's mother gave notice to the County, purportedly in accordance with the LGTCA, of the alleged negligence of the doctor involved in the delivery and her intention to sue him for malpractice for injuries sustained by her son. The mother then filed suit on behalf of her son, and individually, and filed a motion asking the court to waive the notice requirements of the LGTCA for good cause. She argued in support that she had not known that the medical facility where she received prenatal care was operated by the County or that the doctor involved in the delivery was a County employee.

The circuit court denied the motion and dismissed the case. In so ruling, it rejected the mother's argument, observing that for 8 ½ years she had done nothing to investigate to determine the legal identity of the doctor; that she was on inquiry notice of the malpractice at the time of the delivery; that a reasonable investigation would have revealed the connection between the doctor and the County, given that he worked for the County-run clinic; and that the failure to investigate was a failure to exercise due diligence, as any ordinarily prudent person in the mother's situation would have investigated.

On appeal, this Court affirmed, and the Court of Appeals agreed. The Court quoted *Heron v. Strader,* 361 Md. 258, 761

---

8. The *Longtin* Court expressly based its holding on the issue of the timeliness of the notice that was given, not on the issues of good cause and prejudice. Op. at 196–97, 26 A.3d at 1024.

9. The doctor was employed by the County on a part-time basis through a program called "Project Delivery" that worked with patients receiving prenatal care at a clinic operated by the County. The mother was receiving prenatal care at that clinic.

A.2d 56 (2000), that " '[t]he test for whether good cause exists ... is "whether the claimant prosecuted his claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances." ' " *Rios*, at 141, 872 A.2d 1 (quoting *Heron*, at 271, 761 A.2d 56, in turn quoting *Westfarm Assoc. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 676–77 (4th Cir.1995)). It further pointed out that in *Heron*, the Court "identified four categories of good cause recognized" in other jurisdictions. *Id.* They are " 'excusable neglect or mistake (generally determined in reference to a reasonably prudent person standard), serious physical or mental injury and/or location out-of-state, the inability to retain counsel in cases involving complex litigation, and ignorance of the statutory notice requirement.' " *Id.* (quoting *Heron*, at 272, 761 A.2d 56) (citations omitted). In a footnote, the Court also mentioned that whether ignorance of the LGTCA notice provisions ever could constitute good cause to excuse noncompliance remained an "open" question. *Id.* at 141–42 n. 18, 872 A.2d 1.

The primary argument advanced on appeal by the mother in *Rios* was that a plaintiff's status as a minor should constitute *per se* good cause for non-compliance with the LGTCA notice requirements. The Court of Appeals declined to so hold, but recognized that a plaintiff's minority is one factor for a court to consider in determining, within its discretion, whether good cause exists.

We return to the case at bar. The circuit court's order granting summary judgment states that its decision was made "[u]pon consideration of the Defendant [HABC]'s Motion for Summary Judgment (docket no. 18) and for the reasons stated on the record in open court." The HABC's motion for summary judgment attached Torain's interrogatory answers and deposition transcript along with the affidavit of Peach and the blood lead level reports for Mitchell from the State Department of Health and Mental Hygiene. Its accompanying memorandum of law devoted three pages to the issue of good cause, which included an in depth discussion of *Rios.* The HABC argued that, given that Mitchell's first elevated blood

lead level occurred in April 1989 and neither he nor Torain did anything to pursue a claim on their behalf for 19 years, they failed to exercise *"any* degree of diligence in prosecuting their claim, much less the degree of diligence that an ordinarily prudent person would have exercised under the same circumstances." HABC's Memorandum in Support of Motion for Summary Judgment, at 13 (emphasis in original).

The HABC's memorandum of law contains an additional two pages addressing the issue of prejudice. At pages 13–14, it quotes the following observation of the Court of Appeals that the purpose of the LGTCA's notice requirements is

"to protect [local governments] from meretricious claimants and exaggerated claims by providing a mechanism whereby the [local government] would be apprised of its possible liability at a time when it could conduct its own investigation, *i.e.,* while the evidence was still fresh and the recollection of the witnesses was undiminished by time, 'sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.[']"

*Moore v. Norouzi,* 371 Md. at 167–68, 807 A.2d 632 (quoting *Williams,* 359 Md. at 389–90, 754 A.2d 379 (citation omitted)). The HABC argued that it was substantially prejudiced by the failure to give notice in this case because the lack of notice resulted in its not learning of the claim until it was served with the complaint on April 11, 2008, 19 years after the alleged events. During that time, the tenant file for Torain and Mitchell was destroyed; the maintenance and any other records related to the 1011 Valley Street premises during the time that Mitchell lived there were destroyed; and virtually all of the HABC employees who would have had any involvement with the premises—"development managers, engineering and housing personnel, maintenance workers, and related personnel"—had left, so they could not be interviewed and the information they would have had could not be accessed. The HABC also argued that the failure to give notice prevented it from planning and budgeting for any potential liability, all to its detriment.

Mitchell responded to the motion for summary judgment with an opposition memorandum of five pages, virtually all of which was devoted to the issues of good cause and prejudice. On the issue of good cause, he argued that Dr. Zuckerberg's affidavit showed that Mitchell had suffered serious brain injury as a result of his exposure to lead paint, but that his injuries were latent, and therefore did not appear at the time of exposure; and that neither Mitchell nor Torain even knew of the LGTCA, or its notice requirements, until after they had filed suit. On the issue of prejudice, Mitchell argued that the loss of records was the HABC's fault, as it had a record retention policy of only three years, and that the HABC had not shown that it had taken all steps necessary to find the people who no longer worked for it who would have information relevant to the case.

At the summary judgment hearing, the judge made clear that she had read all of the parties' papers and remarked that she had taken "two pages" of notes. Counsel for the HABC and counsel for Mitchell argued at length about good cause and prejudice. Throughout the hearing, the judge interjected comments and asked questions about the good cause issue. For example, when Mitchell's lawyer argued that his clients' ignorance of the notice provisions of the LGTCA was good cause to excuse their noncompliance, the judge was unpersuaded, remarking, "if that gets to be the defense then, and that gets to be the basis by itself, then I think the, I think really the statute is gone." As noted above, at the conclusion of argument, the judge ruled from the bench, stating that she was granting the HABC's motion for summary judgment because "the claim [was] barred by the [LGTCA]."

■■■ The record belies Mitchell's assertion that the judge did not consider the evidence he submitted on the issue of good cause. To be sure, the judge did not make specific findings or explain the reasons why she decided to exercise her discretion to rule that good cause was not shown or, if it was, that there was an affirmative showing of prejudice. That does not mean, however, that she did not give any consider-

ation to the evidence on the summary judgment record or the arguments on good cause and prejudice that were advanced by counsel. The absence of an express reference to good cause or prejudice in her oral ruling does not mean that the judge did not consider those issues or the evidence about them in making her decision. *See N. River Ins. Co. v. Mayor & City Council,* 343 Md. 34, 90, 680 A.2d 480 (1996) ("In that regard, and clearly relevant to whether there has been an abuse of discretion is a proposition that is of some considerable significance in our jurisprudence, that judges are presumed to be men [and women] of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence.") (internal quotations and citations omitted). Moreover, as we have pointed out, the order the judge signed states that she granted summary judgment for the reasons stated on the record and the reasons given in the HABC's motion for summary judgment.

We simply find no support in the record for Mitchell's argument that the circuit court judge abused her discretion by failing to consider and exercise her discretion with respect to his evidence and arguments. On the contrary, the record supports the conclusion that the judge considered the state of the summary judgment record and the arguments advanced by counsel and was persuaded by the HABC's arguments, not by Mitchell's arguments. Certainly, the judge's exercise of discretion was not an abuse of discretion. The notice required by the LGTCA may be given by the injured person or a representative. Therefore, even assuming that Mitchell suffered serious brain damage as a consequence of exposure to lead as a child, his mother, who was not a minor at the time they lived at the Valley Street address, or another representative could have taken the required steps to notify the HABC in accordance with CJP section 5–304.

The facts in the summary judgment record did not show that any steps were taken at any time by Torain or anyone else to investigate the source and consequences of Mitchell's exposure to lead paint while he was living at the Valley Street address (or at any other address that he occupied as a child).

Torain's deposition, which was among the documents reviewed by the court, showed that she knew that the HABC owned the Valley Street premises. In addition, she knew about Mitchell's positive blood lead level test results. She simply did nothing to investigate. In addition, the neuropsychologist's report submitted by Mitchell in support of his opposition to the motion for summary judgment showed that Mitchell already was suffering behavioral problems associated with lead exposure by the time he was in kindergarten. The judge in the case at bar may well have decided to exercise her discretion in favor of good cause if notice had not been given until symptoms of that sort emerged when Mitchell was a young child. The time lapse here was extreme, however, with notice not being given until 19 years after the events. And, despite Mitchell's arguments to the contrary, the HABC made what a reasonable judge deciding the motion could have believed was a strong showing of prejudice, as it no longer had any documents or witnesses, and the mere passage of 19 years would be sufficient to dim even the brightest memory.

Finally, Mitchell argues that the LGTCA notice provision should not apply, or should not apply as strictly, to actions arising from exposure to lead-based paint, citing *Longtin*, 190 Md.App. 97, 988 A.2d 20 (2010), *affirmed on other grounds on issue of notice, Longtin, supra*, 419 Md. 450, 19 A.3d 859, in support. In that case, we affirmed a circuit court judge's discretionary decision finding good cause to excuse noncompliance with the LGTCA notice requirement. The case is easily distinguishable both for its procedural posture and on its facts.

As discussed above, Longtin was charged with the rape and murder of his wife. He was incarcerated for eight months on these charges prior to being released after DNA evidence excluded him and, ultimately, implicated another individual. Prince George's County ("the County") argued that Longtin's state constitutional claims accrued from the date of his arrest and he therefore was required to give notice under the LGTCA within 180 days of that date, *i.e.*, while he remained incarcerated. Longtin did not give notice of his claims until

approximately four months after his release from incarceration (over 12 months after his arrest).

■■■ The circuit court rejected the County's argument, finding that Longtin had demonstrated good cause for his failure to timely comply with the LGTCA notice requirement and that the County had failed to demonstrate any prejudice. On appeal to this Court, we affirmed. Thus, unlike the instant case, in which Mitchell asks us to reverse the circuit court's discretionary decision finding a lack of good cause, in *Longtin* we were asked whether under the material facts the circuit court acted within its broad discretion in finding that good cause existed. As we have explained, "[f]ar less is required to support a merely negative instance of non-persuasion than is required to support an affirmative instance of actually being persuaded of something." *Pollard's Towing, Inc. v. Berman's Body Frame & Mech., Inc.,* 137 Md.App. 277, 289–90, 768 A.2d 131 (2001).

We also note that the length of the delay in giving notice in *Longtin* was just six months, whereas in the instant case, the delay was 19 years. Thus, there was evidence that, once released from incarceration, Longtin acted diligently to investigate and give notice of his claim. Moreover, this Court emphasized that Longtin did not become aware until after the expiration of the 180–day notice period that, only three months after his arrest, DNA testing excluded him as a suspect in the rape. Thus, a key component of his claim of a due process violation was not even known to him during the period of his incarceration. For all of these reasons, *Longtin* is distinguishable from the instant case.

## III.

### *Waiver*

■■■ Finally, Mitchell contends the HABC waived its LGTCA notice defense by waiting sixteen months after suit was filed to move for summary judgment. As the HABC responds, the case law makes clear that the notice requirement of the LGTCA is a condition precedent to filing suit and

cannot be waived. *See Rios*, 386 Md. at 126–28, 872 A.2d 1. Accordingly, any delay in asserting this defense cannot be construed as a waiver. We note, moreover, that there was no delay in asserting the waiver defense in any event. The defense was timely raised in HABC's answer.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**